Ferrari S.P.A. ESERCIZIO Fabriche
Automobili E Corse, Plaintiff–
Appellee,

v.

Carl ROBERTS, d/b/a Roberts Motor
Company, Defendant–Appellant.

No. 90–5734.

United States Court of Appeals,
Sixth Circuit.

Argued March 25, 1991.

Decided Sept. 5, 1991.

W.F. Shumate (argued and briefed). Bobby Bishop, Jr., Steven K. Bowling, Richard S. Wirtz, Knoxville, Tenn., for defendant-appellant.

Before KENNEDY and RYAN, Circuit Judges, and FEIKENS, Senior District Judge.[*]

RYAN, Circuit Judge.

This is a trademark infringement action brought pursuant to the Lanham Act, 15 U.S.C. § 1051, *et seq.* The principal issue is whether the district court correctly concluded that plaintiff Ferrari enjoyed unregistered trademark protection in the exterior shape and appearance of two of its automobiles and, if so, whether defendant Roberts' replicas of Ferrari's designs infringed that protection, in violation of section 43(a) of the Lanham Act. More narrowly focused, the issues are:

—Whether Ferrari's automobile designs have acquired secondary meaning;

—Whether there is a likelihood of confusion between Ferrari's cars and Roberts' replicas;

—Whether the appropriated features of Ferrari's designs are nonfunctional; and

—Whether the injunction granted by the district court is excessively broad.

We must also decide whether the district court, 739 F.Supp. 1138, properly rejected Roberts' request for a jury trial.

We hold that the district court properly decided all of the issues and, therefore, we shall affirm.

## I.

### The Facts

Ferrari is the world famous designer and manufacturer of racing automobiles and upscale sports cars. Between 1969 and 1973, Ferrari produced the 365 GTB/4 Daytona. Because Ferrari intentionally limits production of its cars in order to create an image of exclusivity, only 1400 Daytonas

Ed E. Williams, III, Robert D. Van de Vuurst, Baker, Worthington, Crossley, Stansberry & Woolf, Johnson City, Tenn., Albert Robin, Jonathan I. Blackman (argued), Lawrence B. Friedman (briefed), Cleary, Gottlieb, Steen & Hamilton, New York City, for plaintiff-appellee.

[*] The Honorable John Feikens, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

were built; of these, only 100 were originally built as Spyders, soft-top convertibles. Daytona Spyders currently sell for one to two million dollars. Although Ferrari no longer makes Daytona Spyders, they have continuously produced mechanical parts and body panels, and provided repair service for the cars.

Ferrari began producing a car called the Testarossa in 1984. To date, Ferrari has produced approximately 5000 Testarossas. Production of these cars is also intentionally limited to preserve exclusivity: the entire anticipated production is sold out for the next several years and the waiting period to purchase a Testarossa is approximately five years. A new Testarossa sells for approximately $230,000.

Roberts is engaged in a number of business ventures related to the automobile industry. One enterprise is the manufacture of fiberglass kits that replicate the exterior features of Ferrari's Daytona Spyder and Testarossa automobiles. Roberts' copies are called the Miami Spyder and the Miami Coupe, respectively. The kit is a one-piece body shell molded from reinforced fiberglass. It is usually bolted onto the undercarriage of another automobile such as a Chevrolet Corvette or a Pontiac Fiero, called the donor car. Roberts marketed the Miami Spyder primarily through advertising in kit-car magazines. Most of the replicas were sold as kits for about $8,500, although a fully accessorized "turnkey" version was available for about $50,000.

At the time of trial, Roberts had not yet completed a kit-car version of the Miami Coupe, the replica of Ferrari's Testarossa, although he already has two orders for them. He originally built the Miami Coupe for the producers of the television program "Miami Vice" to be used as a stunt car in place of the more expensive Ferrari Testarossa.

The district court found, and it is not disputed, that Ferrari's automobiles and Roberts' replicas are virtually identical in appearance.

Ferrari brought suit against Roberts in March 1988 alleging trademark infringement, in violation of section 43(a) of the Lanham Act, and obtained a preliminary injunction enjoining Roberts from manufacturing the replica cars. The injunction was later amended to permit Roberts to recommence production of the two models.

Five months later, Roberts filed a voluntary petition in bankruptcy. Despite the Chapter 11 proceedings, the bankruptcy court, in a carefully limited order, lifted the automatic stay and permitted Ferrari to continue to prosecute this action. Prior to trial, the district court denied Roberts' request for a jury, and the case was tried to the court resulting in a verdict for Ferrari and a permanent injunction enjoining Roberts from producing the Miami Spyder and the Miami Coupe.

## II.

Section 43(a) of the Lanham Act creates a civil cause of action for trademark infringement. In relevant part, section 43(a) provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person....

. . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

The protection against infringement provided by section 43(a) is not limited to "goods, services or commercial activities" protected by registered trademarks. It extends as well, in certain circumstances, to the unregistered "trade dress" of an article. "Trade dress" refers to "the im-

age and overall appearance of a product." *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 812 (5th Cir.1989). It embodies "that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, intended to make the source of the product distinguishable from another and to promote its sale." *Mr. Gasket Co. v. Travis*, 35 Ohio App.2d 65, 72 n. 13, 299 N.E.2d 906, 912 n. 13 (1973).

Ferrari's Lanham Act claim in this case is a "trade dress" claim. Ferrari charges, and the district court found, that the unique and distinctive exterior shape and design of the Daytona Spyder and the Testarossa are protected trade dress which Roberts has infringed by copying them and marketing his replicas.

Roberts asserts that there has been no infringement under section 43(a) for a number of reasons: (1) the design of Ferrari's vehicles are protected only under design patent law, *see* 35 U.S.C. § 171, and not the Lanham Act; (2) there is no actionable likelihood of confusion between Ferrari's vehicles and Roberts' replicas at the point of sale; and (3) the "aesthetic functionality doctrine" precludes recovery.

We shall take up each argument in turn.

### III.

■ To prove a violation of section 43(a), Ferrari's burden is to show, by a preponderance of the evidence:

1) that the trade dress of Ferrari's vehicles has acquired a "secondary meaning,"
2) that there is a likelihood of confusion based on the similarity of the exterior shape and design of Ferrari's vehicles and Roberts' replicas, and
3) that the appropriated features of Ferrari's trade dress are primarily nonfunctional.

*See Kwik–Site Corp. v. Clear View Mfg. Co., Inc.*, 758 F.2d 167, 178 (6th Cir.1985).

### A.

#### Secondary Meaning

■ To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, "That is the article I want because I know its source," and not the negative inquiry as to "Who makes that article?" In other words, the article must proclaim its identification with its source, and not simply stimulate inquiry about it.

*West Point Mfg. Co. v. Detroit Stamping Co.*, 222 F.2d 581, 595 (6th Cir.) (citation omitted), *cert. denied*, 350 U.S. 840, 76 S.Ct. 80, 100 L.Ed. 749 (1955). Arguably, secondary meaning in this case can be presumed from Roberts' admissions that he intentionally copied Ferrari's designs. Roberts told Vivian Bumgardner, an investigator who recorded her conversations with Roberts, that "we put this whole body right on it and it looks just like a real car, I mean they can't tell by looking.... We build and sell the same car, reproduce it." The intent to copy was also shown by Roberts' use of the distinctive Ferrari prancing horse logo on the front parking lights of the Daytona Spyder and in advertising brochures. The original Miami Coupe brochure even copied the Ferrari name by referring to the Roberts' car as the "Miami Testarossa." The evidence of intentional copying shows the strong secondary meaning of the Ferrari designs because "[t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir.1960).

■ Ferrari, however, need not rely on a presumption of secondary meaning because the evidence at trial showed that the exterior design of Ferrari's vehicles enjoyed strong secondary meaning. Lawrence Crane, Art Director of *Automobile* magazine, testified that the shape of a Ferrari "says Ferrari to the general populous (sic)" and that "because it's so instantly recognizable ... we've used even just portions of Ferraris, the Testarossa, for instance, and people recognize it, and our sales are changed." William Moore, Editor of *Kit Car Illustrated*, and a witness for Roberts,

conceded that car replica manufacturers frequently copy Ferraris because the "special image" associated with Ferrari creates a market for cars which look like Ferraris. The testimony of Crane and Moore was supported by survey data which indicated that of survey respondents shown photographs of Ferrari's cars without identifying badges, 73% properly identified a photograph of Daytona Spyder as manufactured by Ferrari and 82% identified the Testarossa as a Ferrari product. Such survey evidence, combined with intentional copying and the widespread publicity surrounding Ferraris, convinced the court in a separate action brought by Ferrari against Roberts' former partner to enjoin him from producing replicas of the Daytona Spyder identical to those produced by Roberts, that the Ferrari vehicle design has a secondary meaning:

> In light of defendants' close intentional copying, their failure to introduce any evidence to show that such copying was for any purpose but to associate themselves with the reputation and marketability of the Ferrari DAYTONA SPYDER, the large amount of recognition of said design with Ferrari shown in continuous magazine articles and books about the DAYTONA SPYDER long after the cessation of its manufacture, the showings of the Ferrari DAYTONA SPYDER at vintage car shows, the highly publicized sales of said car by Ferrari customers, and the percentages of recognition in both the plaintiff's and the defendants' surveys, ... the court finds the evidence thorough and convincing that the Ferrari DAYTONA SPYDER design has achieved a strong secondary meaning.

*Ferrari S.P.A. v. McBurnie*, 11 U.S.P.Q.2d 1843, 1846–47 (S.D.Cal.1989).

Ferrari's vehicles would not acquire secondary meaning merely because they are unique designs or because they are aesthetically beautiful. The design must be one that is instantly identified in the mind of the informed viewer as a Ferrari design. The district court found, and we agree, that the unique exterior design and shape of the Ferrari vehicles are their "mark" or "trade dress" which distinguish the vehicles' exterior shapes not simply as distinctively attractive designs, but as Ferrari creations.

We also agree with the district court that Roberts' admission that he intentionally copied Ferrari's design, the survey evidence introduced by Ferrari, and the testimony of Crane and Moore amount to abundant evidence that the exterior design features of the Ferrari vehicles are "trade dress" which have acquired secondary meaning.

■ Roberts argues strongly that section 43(a) provides no trademark infringement protection for the exterior design of a product because "automobile designs are to be protected from copying only pursuant to the design patent statute," and Ferrari, during the period relevant to this case, had not protected the Daytona Spyder or the Testarossa with a design patent. We disagree.

Courts have consistently rejected Roberts' argument that the availability of design patent protection precludes applicability of the Lanham Act for products whose trade dress have acquired strong secondary meaning. Actionable harm results from *either* infringing a design patent or copying a product with secondary meaning. *Mastercrafters Clock & Radio Co. v. Vacheron & Constantin–Le Coultre Watches, Inc.*, 221 F.2d 464, 466 (2d Cir.), *cert. denied*, 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743 (1955). *See also Audio Fidelity*, 283 F.2d at 555. As the court explained in *Rolls–Royce Motors, Ltd. v. A & A Fiberglass, Inc.*, 428 F.Supp. 689, 692–93 (N.D.Ga.1977):

> There is no doubt that the plaintiffs' Classic Grill and Flying Lady are attractive objects. As such, they may be deserving of copyright or design patent protection. Their entitlement to trademark recognition, however, depends not on their eye appeal but on their characteristic of identifying the manufacturer of Rolls–Royce motor cars.

Likewise, the distinctive appearance of a Ferrari's exterior shape, as evidenced at trial by surveys and the testimony of car magazine editors and others, entitles Fer-

rari to Lanham Act protection. This trademark protection does not unduly extend the seventeen-year monopoly guaranteed by the patent laws because the two sources of protection are totally separate:

> [T]rademark rights, or rights under the law of unfair competition, which happen to continue beyond the expiration of a design patent, do not "extend" the patent monopoly. They exist independently of it, under different law and for different reasons. The termination of either has no legal effect on the continuance of the other.

*Application of Mogen David Wine Corp.,* 328 F.2d 925, 930, 51 CCPA 1260 (1964). Patent and trademark law are completely distinct fields:

> The protection accorded by the law of trademark and unfair competition is greater than that accorded by the law of patents because each is directed at a different purpose. The latter protects inventive activity which, after a term of years, is dedicated to the public domain. The former protects commercial activity which, in our society, is essentially private.

*Truck Equip. Serv. Co. v. Fruehauf Corp.,* 536 F.2d 1210, 1215 (8th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976).

The dissent disagrees that patent and trademark law are distinct fields of law. The dissent, citing *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989); *Compco Corp. v. Day–Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964); and *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), argues that Ferrari's designs are not protected because unpatented goods may be freely copied. In the cases cited in the dissenting opinion, the Supreme Court examined state unfair competition laws to determine whether federal patent law preempted their application. In all three cases, the Court held that a state, through its unfair competition laws, could not extend patent protection to otherwise unprotected designs because such protec-

tion conflicted with the federal policy of substantially free trade in unpatented design and utilitarian concepts. *See Bonito Boats,* 489 U.S. at 152–54, 109 S.Ct. at 978–79.

These cases, however, do not affect the applicability of the Lanham Act in this case. First, the Court in *Compco* expressly noted that a defendant can copy at will if the design is "not entitled to a design patent *or other federal statutory protection....*" *Compco,* 376 U.S. at 238, 84 S.Ct. at 782 (emphasis added). Thus, Roberts cannot copy at will because "other federal statutory protection," the Lanham Act, applies. Second, these cases involved only the preemption of state unfair competition law by federal patent law, not the scope of federal trademark or unfair competition law. Because trademark law and patent law address different concerns, and because of the narrow focus of the Supreme Court's inquiry in *Compco* and *Sears,* courts have explicitly held that these decisions do not preclude Lanham Act protection of designs. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204 (2d Cir.1979); *Rolls–Royce Motors,* 428 F.Supp. 689.

Thus, Lanham Act protection is available to designs which also might have been covered by design patents as long as the designs have acquired secondary meaning. *Dallas Cowboys Cheerleaders,* 604 F.2d at 204–05; *Truck Equip. Serv.,* 536 F.2d 1210; *Mogen David,* 328 F.2d 925; *Rolls–Royce,* 428 F.Supp. 689. Ferrari's designs have clearly acquired secondary meaning and thus were entitled to protection.

### B.

### Likelihood of Confusion

#### 1.

#### District Court's Findings

This court has held that in determining likelihood of confusion in a Lanham Act case, the court should consider the following factors: strength of the plaintiff's mark; relatedness of the goods; similarity of the marks; evidence of actual confusion; marketing channels used; likely

degree of purchaser care; defendant's intent in selecting the mark; and likelihood of expansion of the product lines. *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642, 648 (6th Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982). A party claiming infringement need not show all, or even most, of these factors in order to prevail. *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988). A district court's findings regarding each factor are reviewed for clear error, but the further determination of likelihood of confusion based on those factors is a legal conclusion reviewed *de novo*. *Frisch's Restaurants*, 670 F.2d at 651.

The district court found, based upon an evaluation of the eight *Frisch* factors, that the similarity of the exterior design of the Ferrari vehicles and the Roberts replicas was likely to confuse the public. The court noted that while no evidence was offered on two of the factors, evidence of actual confusion and likelihood of expansion of the product lines, two others, marketing channels and purchaser care, favored Roberts and the remaining factors "radically favor[ed] Ferrari." Summarized, the district court's findings on the *Frisch* "likelihood of confusion" factors are as follows:

| Factors | Favor |
|---|---|
| 1. Strength of the mark | Ferrari |
| 2. Relatedness of the goods | Ferrari |
| 3. Similarity of the marks | Ferrari |
| 4. Evidence of actual confusion | No evidence |
| 5. Marketing channels used | Roberts |
| 6. Likely degree of purchaser care | Roberts |
| 7. Roberts' intent in selecting "mark" | Ferrari |
| 8. Likelihood of expansion of product lines. | No evidence |

Recalling that the claimed mark involved here is the trade dress—the exterior shape and design of the Ferrari vehicles—it is clear that Ferrari's mark is very strong. The strength of the mark is its distinctiveness and Ferrari's designs are unquestionably distinctive. The survey evidence we have discussed, as well as the testimony that the shape of the plaintiff's vehicles "says Ferrari," is evidence of that distinctiveness. Indeed, Roberts' purposeful effort to copy the Ferrari designs is strong

circumstantial evidence of the distinctiveness of the originals.

There is no dispute about the relatedness of the goods factor. The products produced by both parties are sports cars.

Likewise, the similarity of the marks—the exterior designs of the vehicles—is indisputable. Ferrari offered survey evidence which showed that 68% of the respondents could not distinguish a photograph of the McBurnie replica, upon which Roberts' Miami Spyder is based, from a photograph of the genuine Ferrari Daytona Spyder. In these photographs, the cars were shown without identifying insignia. Drawings for Roberts' cars show identifying insignia, an "R" on the parking lens and vent window, but the cars produced at the time of trial did not include the "R". Because the survey respondents saw photographs of the McBurnie cars, and because all of the identifying insignia were removed, the survey has limited value in showing the likelihood of confusion between the Roberts and Ferrari vehicles if displayed with identifying emblems. The survey, however, does show that the trade dress of the two car designs, the shapes and exteriors, were quite similar. An examination of the photographs of the cars which are in evidence confirms the striking similarity of the dress of the originals and the replicas. They are virtually indistinguishable.

■ Finally, Roberts conceded that his intent in replicating the exterior design of Ferrari's vehicles was to market a product that looked as much as possible like a Ferrari original, although Roberts made no claim to his customers that his replicas were Ferraris. " '[The] intent of [a party] in adopting [another's mark] is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of [the plaintiff,] *that fact alone may be sufficient to justify the inference that there is confusing similarity.*' " *Frisch's Restaurants*, 670 F.2d at 648 (emphasis in original) (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980)); *see also*

*Mastercrafters,* 221 F.2d at 467. This is especially true in cases, such as this one, where the defendant sold a comparatively cheap imitation of an expensive, exclusive item. As the court in *Rolex Watch* explained:

> By selling the bogus watches, only one inference may be drawn: the Defendants intended to derive benefit from the Plaintiff's reputation. This inference is no less reasonable when weighed against the Defendants' assertion that in selling these watches, they did not fail to inform the recipients that they were counterfeits.

*Rolex Watch, U.S.A., Inc. v. Canner,* 645 F.Supp. 484, 492 (S.D.Fla.1986). Intentional copying, however, is not actionable under the Lanham Act "absent evidence that the copying was done with the intent to derive a benefit from the reputation of another." *Zin–Plas Corp. v. Plumbing Quality AGF Co.,* 622 F.Supp. 415, 420 (W.D.Mich.1985). "Where the copying by one party of another's product is not done to deceive purchasers and thus derive a benefit from another's name and reputation, but rather to avail oneself of a design which is attractive and desirable, a case of unfair competition is not made out." *West Point Mfg.,* 222 F.2d at 586. In this case, where Ferrari's design enjoyed strong secondary meaning and Roberts admitted that he designed his cars to look like Ferrari's, the intent to copy was clear.

■ We conclude that aside from the presumption of likelihood of confusion that follows from intentional copying, Ferrari produced strong evidence that the public is likely to be confused by the similarity of the exterior design of Ferrari's vehicles and Roberts' replicas.

## 2.

### Roberts' Objections

Roberts disagrees with the legal significance of the district court's findings of likelihood of confusion. He argues that for purposes of the Lanham Act, the requisite likelihood of confusion must be confusion at the point of sale—purchaser confusion— and not the confusion of nonpurchasing, casual observers. The evidence is clear that Roberts assured purchasers of his replicas that they were not purchasing Ferraris and that his customers were not confused about what they were buying.

Roberts also argues that actionable confusion may not be inferred from intentional copying when the intentional copying involves the design of a product as opposed to the copying of a trademark, trade name or trade dress. Implicit, of course, is Roberts' related argument that the exterior shape and design of the Ferrari cars is not, and cannot be, a trademark or trade dress. We disagree with these contentions.

### a.

### Confusion as to Source

■ Roberts is correct that, for the most part, similarity of products alone is not actionable; there must also be confusion as to the origin of the product. *West Point Mfg.,* 222 F.2d at 589; *see also Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.,* 626 F.2d 193, 195 (1st Cir.1980). Similarity of products, however, does become actionable when the similarity leads to confusion as to source and the public cares who the source of the product is.

> [O]ne who claims that another is guilty of unfair competition in copying his product, must show that the consuming public is primarily concerned in the producer, rather than in the product itself; ... the only obligation of the copier is to identify its product lest the public be mistaken into believing that it was made by the prior patentee.

*West Point Mfg.,* 222 F.2d at 589. Thus, in *West Point Mfg.,* there was no unfair competition where the plaintiff had not shown that the public cared who produced the clamp; no secondary meaning had attached to the plaintiff's clamp. *West Point,* however, does not hold that similarity of appearance may never state a claim. In fact, the *West Point* court explicitly recognized that a different case would exist where there is strong secondary meaning:

> Appellee cites *Wesson v. Galef,* [286 F. 621 (D.C.N.Y.1922)] as sustaining its

contention that the exact copying of the features of appellee's clamp resulted in unfair competition. That case is distinguishable. There, the ensemble of plaintiff's revolver, a Smith & Wesson, had come to mean the product of the manufacture of plaintiff, an old and well-known firm. In fact, few products in the past have been better known than the Smith & Wesson, along with the Colt revolver. The mere mention of their names in former times has inflamed the imagination of youths dreaming of deeds of derring-do; and these guns have been known to generations of soldiers, sportsmen, and police officers, as well as to their quarry. The Smith & Wesson revolver had many peculiar features which had made it known to the public as the product of the manufacturer of those guns. The barrel, for instance, was squared at the frame end, which was unnecessary. This was copied, as well as its peculiar profile. A stop on the left to hold the chamber when it was swung out of position was exactly imitated in shape. Other well-known characteristics of the gun were also copied. In view of these circumstances, the court found that the purpose of the imitation was to sell the copy as a Smith & Wesson revolver. In the instant case, there is no evidence to support any such findings.

*Id.* at 597. In contrast to *West Point*, Roberts copied the nonfunctional features of an item having great secondary meaning.

Because consumers care that they are purchasing a Ferrari as opposed to a car that looks like a Ferrari, and because Roberts' replicas look like Ferraris, Ferrari presented an actionable claim as to confusion of source.

### b.

### Confusion at Point of Sale

 Roberts argues that his replicas do not violate the Lanham Act because he informed his purchasers that his significantly cheaper cars and kits were not genuine Ferraris and thus there was no confusion at the point of sale. The Lanham Act, however, was intended to do more than protect consumers at the point of sale. When the Lanham Act was enacted in 1946, its protection was limited to the use of marks "likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services." In 1967, Congress deleted this language and broadened the Act's protection to include the use of marks "likely to cause confusion or mistake or to deceive." Thus, Congress intended "to regulate commerce within [its control] by making actionable the deceptive and misleading use of marks in such commerce; [and] ... to protect persons engaged in such commerce against unfair competition...." 15 U.S.C. § 1127. Although, as the dissent points out, Congress rejected an anti-dilution provision when recently amending the Lanham Act, it made no effort to amend or delete this language clearly protecting the confusion of goods *in commerce*. The court in *Rolex Watch* explicitly recognized this concern with regulating commerce:

> The real question before this Court is whether the alleged infringer has placed a product *in commerce* that is "likely to cause confusion, or to cause mistake, or to deceive." ... The fact that an immediate buyer of a $25 counterfeit watch does not entertain any notions that it is the real thing has no place in this analysis. Once a product is injected into commerce, there is no bar to confusion, mistake, or deception occurring at some future point in time.

*Rolex Watch*, 645 F.Supp. at 492–93 (emphasis in original). The *Rolex Watch* court noted that this interpretation was necessary to protect against the cheapening and dilution of the genuine product, and to protect the manufacturer's reputation. *Id.* at 495; *see also Mastercrafters*, 221 F.2d at 466. As the court explained:

> Individuals examining the counterfeits, believing them to be genuine Rolex watches, might find themselves unimpressed with the quality of the item and consequently be inhibited from purchasing the real time piece. Others who see the watches bearing the Rolex trade-

marks on so many wrists might find themselves discouraged from acquiring a genuine because the items have become too common place and no longer possess the prestige once associated with them. *Rolex Watch*, 645 F.Supp. at 495; *see also Mastercrafters*, 221 F.2d at 466. Such is the damage which could occur here. As the district court explained when deciding whether Roberts' former partner's Ferrari replicas would be confused with Ferrari's cars:

> Ferrari has gained a well-earned reputation for making uniquely designed automobiles of quality and rarity. The DAYTONA SPYDER design is well-known among the relevant public and exclusively and positively associated with Ferrari. If the country is populated with hundreds, if not thousands, of replicas of rare, distinct, and unique vintage cars, obviously they are no longer unique. Even if a person seeing one of these replicas driving down the road is not confused, Ferrari's exclusive association with this design has been diluted and eroded. If the replica Daytona looks cheap or in disrepair, Ferrari's reputation for rarity and quality could be damaged....

*Ferrari*, 11 U.S.P.Q.2d at 1848. The dissent argues that the Lanham Act requires proof of confusion at the point of sale because the eight factor test used to determine likelihood of confusion focuses on the confusion of the purchaser, not the public. The dissent submits that three of the factors, marketing channels used, likely degree of purchaser care and sophistication, and evidence of actual confusion, specifically relate to purchasers. However, evidence of actual confusion is not limited to purchasers. The survey evidence in this case showed that members of the public, but not necessarily purchasers, were actually confused by the similarity of the products. Moreover, the other five factors, strength of the mark, relatedness of the goods, similarity of the marks, defendant's intent in selecting the mark, and likelihood of product expansion, do not limit the likelihood of confusion test to purchasers.

Since Congress intended to protect the reputation of the manufacturer as well as to protect purchasers, the Act's protection is not limited to confusion at the point of sale. Because Ferrari's reputation in the field could be damaged by the marketing of Roberts' replicas, the district court did not err in permitting recovery despite the absence of point of sale confusion.

### 3.

### Product Confusion

■ Roberts argues that the exterior design features of the Ferrari vehicles are not entitled to Lanham Act protection because only packages in which products are marketed, not products themselves, are covered as protected trade dress. In many cases, the policy of fulfilling consumer demand mandates that trade dress, including packaging and labeling, but not products, are protected from imitation:

> Appellant could not prevent appellee from using railroad sounds in a record, but should be able to prevent duplication of a "form of dress ... primarily adopted for purposes of identification and individuality," and "unrelated to basic consumer demands in connection with the product" ..., as distinguished from basic consumer demands or preferences, or attention directed to the container rather than to the product itself.
>
> "[T]he label or ornament is a relatively small and incidental affair, which would not exist at all, or at least would not exist in that shape but for the intent to deceive; whereas the instrument sold is made as it is, partly at least, because of a supposed or established desire of the public for instruments in that form."

*Audio Fidelity*, 283 F.2d at 556–57 (citations omitted). In this case, where the exterior shape and design of the car is a "form of dress ... primarily adopted for purposes of identification and individuality," the interest in free competition of cars would not be impeded by protecting the product itself. We are fortified in this conclusion by the large number of cases extending trademark protection to product designs. *Ferrari*, 11 U.S.P.Q.2d 1843 (Fer-

rari design); *see also Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 772 (9th Cir.1981) (purse design); *Dallas Cowboys Cheerleaders*, 604 F.2d 200 (configuration of color and pattern on uniform); *Truck Equip. Serv.*, 536 F.2d 1210 (trapezoidal shape of semi-trailer truck); *Pagliero v. Wallace China Co.*, 198 F.2d 339 (9th Cir.1952) (china patterns); *Rolex Watch*, 645 F.Supp. 484 (Rolex watch design); *Zin–Plas*, 622 F.Supp. at 419 (shape of tub spouts and shower heads).

Even if a product cannot be protected, Ferrari is correct in asserting that its exteriors qualify as a trade dress. As the court explained in a replication case involving expensive silver patterns, "A product's trade dress ordinarily consists of its packaging. However, the design given a product by its manufacturer also may serve to distinguish it from the products of other manufacturers and hence be protectible trade dress." *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76, 78–79 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1991). In this case, the exterior design is the "packaging" that is the distinctiveness of a Ferrari automobile. The evidence is that Ferraris need no labeling; the shape of the vehicles "says Ferrari."

### C.

Nonfunctionality of Appropriated Features

Trademark law does not protect the functional features of products because such protection would provide a perpetual monopoly of features which could not be patented. *Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822, 825 (3d Cir.1981). A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982). Functionality is a factual determination reviewed only for clear error. *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 77 (2d Cir.1985).

The district court found that Ferrari proved, by a preponderance of the evidence, that the exterior shapes and features of the Daytona Spyder and Testarossa were nonfunctional. The court based this conclusion on the uncontroverted testimony of Angelo Bellei, who developed Ferrari's grand touring cars from 1964–75, that the company chose the exterior designs for beauty and distinctiveness, not utility. Roberts disagrees that Ferrari established nonfunctionality because he believes that the designs are excluded from protection by the "aesthetic functionality doctrine."

The aesthetic functionality test was developed by the Ninth Circuit in *Pagliero*, 198 F.2d 339. In *Pagliero*, the court found that the defendant's copying of the plaintiff's designs for hotel china was not actionable because the designs were functional as "an important ingredient in the commercial success of the product" as opposed to "a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product...." *Id.* at 343. As the court explained:

[O]ne of the essential selling features of hotel china, if, indeed, not the primary, is the design. The attractiveness and eye-appeal of the design sells the china. Moreover, from the standpoint of the purchaser china satisfies a demand for the aesthetic as well as for the utilitarian, and the design on china is, at least in part, the response to such demand. The granting of relief in this type of situation would render Wallace immune from the most direct and effective competition with regard to these lines of china.

*Id.* at 343–44.

The broad scope of aesthetic functionality defined in *Pagliero* has been subsequently criticized and limited. Relating functionality to the commercial desirability of the feature regardless of its utilitarian function discourages the development of appealing designs because such designs would be entitled to less protection. *Keene*

*Corp.*, 653 F.2d at 825; *see also Wallace Int'l Silversmiths*, 916 F.2d 76. Moreover, *Pagliero*'s "important ingredient" formula has been rejected because "[t]rade dress associated with a product that has accumulated goodwill ... will almost always be 'an important ingredient' in the 'saleability' of the product." *LeSportsac*, 754 F.2d at 77. In part because of these concerns, the Ninth Circuit itself later rejected the view that "any feature of a product which contributes to the consumer appeal and saleability of the product is, as a matter of law, a functional element of that product." *Vuitton*, 644 F.2d at 773.

■ Our own circuit seems to have implicitly rejected *Pagliero*'s aesthetic functionality test. In *WSM, Inc. v. Tennessee Sales Co.*, 709 F.2d 1084 (6th Cir.1983), the defendant, who copied plaintiff's amusement park souvenir T-shirts, argued that the design was not protected because of its aesthetic functionality. The court rejected this argument:

> TS' assertion that its use of the involved design is "functional," i.e., "ornamental" or "decorative," is unavailing.... That an item serves or performs a function does not mean, however, that it may not at the same time be capable of indicating sponsorship or origin where aspects of the item are nonfunctional. *Dallas Cowboys Cheerleaders*, [604 F.2d 200]. The district court found that WSM's mark served to indicate source in addition to any "ornamental" function it might also serve. No basis exists for upsetting that finding.

*Id.* at 1087. Thus, the precedent in this circuit suggests that aesthetic functionality will not preclude a finding of nonfunctionality where the design also indicates source.

Other circuits also emphasize identification of source in limiting *Pagliero*. In *Keene Corp.*, the Third Circuit suggested that "the inquiry should focus on the extent to which the design feature is related to the utilitarian function of the product or feature." *Keene Corp.*, 653 F.2d at 825. Thus, trademark law would protect designs not significantly related to a product's utili-

tarian function which had achieved secondary meaning. *Id.* The court noted that this view had already received acceptance in cases holding that distinctive features used for identification were entitled to protection where such features were only incidentally functional. *Dallas Cowboys Cheerleaders*, 604 F.2d at 204; *Application of Penthouse Int'l Ltd.*, 565 F.2d 679, 682 (C.C.P.A.1977); *Truck Equip. Serv.*, 536 F.2d at 1218. The Ninth Circuit also seemed to accept this formulation as a legitimate reading of *Pagliero*. In *Vuitton*, the court noted that the designs in *Pagliero* were adopted because of their aesthetic features and only after extensive advertising later became associated with the manufacturer. *Vuitton*, 644 F.2d at 773. That situation differs greatly from this case in which the Ferrari designs were selected for their distinctiveness.

### D. Scope of Injunction

■ Because we agree with the district court that Ferrari met its burden of establishing a violation of the Lanham Act, we affirm its grant of injunctive relief. The district court enjoined Roberts from

> manufacturing, or selling, or distributing, or in any manner, enabling or aiding others to manufacture, or to sell, or to distribute the Miami Spyder and the Miami Coupe and all versions thereof, including but not limited to their exterior shapes and features, the designs of which have been determined to violate plaintiff's (Ferrari) right to protection under the Lanham Act with respect to 365 GTB/4 (Daytona Spyder) and the Testarossa.

The dissent argues that the injunction is too broad because it enjoins the manufacture of "all versions" of Roberts' vehicles. We disagree. The injunction states that it enjoins the manufacture of "the designs ... which have been determined to violate plaintiff's (Ferrari) right to protection under the Lanham Act" with respect to the Daytona Spyder and the Testarossa. Thus, the district court enjoined the manufacture of the two vehicles which were the subject of the suit before it and which it found

violative of the Lanham Act. The dissent also argues that enjoining the manufacture of the vehicles is not the proper relief where likelihood of confusion could be remedied by proper labeling. This court, however, in an opinion by then Judge Stewart, stated:

> This court has consistently held that when the unfair competition complained of is the marketing of a product in containers or labels deceptively similar to the first comer's containers or labels which have acquired a secondary meaning, the competitor cannot avoid liability merely by affixing his own name.

*Tas–T–Nut Co. v. Variety Nut & Date Co.,* 245 F.2d 3, 7 (6th Cir.1957). Therefore, we affirm the grant of injunctive relief, finding that it is an appropriate remedy for the Lanham Act violations.

### E.

#### Jury Trial

In his answer to Ferrari's complaint, Roberts requested a jury trial. The initial pretrial order, however, set the case for trial without a jury and there was no objection by Roberts. At the time the pretrial order was entered, Roberts was not represented by counsel. Roberts' current counsel, who discovered the error three months later, immediately moved for a jury trial. The district court denied the motion on the ground that Roberts had waived his prior demand by failing to timely object. The case was heard without a jury.

Without relying upon the waiver theory, we conclude, on other grounds, that Roberts was not entitled to a jury trial. Ferrari's complaint requested only equitable relief; an injunction and disgorgement of profits. Moreover, the bankruptcy court's order lifting the automatic stay and permitting Ferrari to continue to prosecute this action limited Ferrari to equitable relief by providing that Ferrari "may continue to prosecute the Ferrari Infringement Action against Mr. Roberts in the U.S. District Court for the Eastern District of Tennessee for the equitable relief that Ferrari seeks therein, not to include any compensatory or punitive damages...." Because

the bankruptcy court permitted Ferrari to seek only equitable relief, Roberts was not entitled to a jury trial.

### IV.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

KENNEDY, Circuit Judge, dissenting.

I respectfully dissent because the majority opinion does more than protect consumers against a likelihood of confusion as to the source of goods; it protects the source of the goods, Ferrari, against plaintiff's copying of its design even if the replication is accompanied by adequate labelling so as to prevent consumer confusion. I believe the majority commits two errors in reaching this result. The majority first misconstrues the scope of protection afforded by the Lanham Act by misapplying the "likelihood of confusion" test and reading an anti-dilution provision into the language of section 43(a). The majority then affirms an injunction that is overbroad. The product of these errors is a remedy that provides defendant with absolute protection in perpetuity against copying its unpatented design. This remedy is contrary to the language and purpose of the Lanham Act and runs afoul of Supreme Court precedent. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989); *Compco Corp. v. Day–Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964); *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964).

### I. Section 43(a) and Trade Dress Protection

The majority invokes the appropriate test to determine whether protection is available for an unregistered trademark pursuant to section 43(a) of the Lanham Act. *Kwik–Site Corp. v. Clear View Mfg. Co.,* 758 F.2d 167 (6th Cir.1985) (secondary meaning; likelihood of confusion; and nonfunctionality of trade dress). While I agree that Ferrari's designs have acquired secondary meaning and are primarily non-

functional, I disagree with the majority's construction and application of the likelihood of confusion test and their conclusion that the Lanham Act protects against dilution of a manufacturer's goods.

This Circuit applies an eight-factor test to determine whether relevant consumers in the marketplace will confuse one item with another item. *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642 (6th Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982). The majority correctly points out one purpose this test is *not* designed to accomplish: "Where the copying by one party of another's product is not done to *deceive purchasers* and thus derive a benefit from another's name and reputation, but rather to avail oneself of a design which is attractive and desirable, a case of unfair competition is not made out." *West Point Mfg. v. Detroit Stamping Co.*, 222 F.2d 581, 586 (6th Cir.) (emphasis added), *cert. denied*, 350 U.S. 840, 76 S.Ct. 80, 100 L.Ed. 749 (1955). This passage properly notes that the statute is triggered when a copier attempts to "palm off" his replica as an original. In other words, the protection afforded by the Lanham Act is primarily to potential purchasers. The protection accruing to a producer is derivative of and only incidental to this primary protection: a producer can market his goods with the assurance that another may not market a replica in a manner that will allow potential purchasers to associate the replica with the producer of the original. Unfortunately, the majority merely pays lip service to this fundamental tenet in its application of the eight-factor test.

The majority never clearly defines the target group that is likely to be confused. Although *West Point* counsels that purchasers must be deceived, the majority concludes that the target group is the "public." The majority errs to the extent that its analysis shifts from potential purchasers to the broader more indefinite group of the "public."

The eight-factor test contemplates that the target group is comprised of potential purchasers. For example, the importance of one factor—evidence of actual confu-sion—is determined by the kinds of persons confused and degree of confusion. "Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight...." *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1110 (6th Cir.1991) (quoting *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir.1982)). Two other factors obviously refer to potential purchasers: the marketing channels used and the likely degree of purchaser care and sophistication. Thus, three of the eight factors expressly focus on the likelihood of confusion as to potential purchasers.

Other courts have made clear that section 43(a) is concerned with the welfare of potential purchasers in the marketplace. *See Kwik–Site*, 758 F.2d at 178 (referring to "intending purchasers" when discussing likelihood of confusion); *see also Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir.1991) (stating that plaintiff must prove that "purchasers are likely to confuse the imitating goods with the originals"); *West Point*, 222 F.2d at 592 (referring to "purchasers exercising ordinary care to discover whose products they are buying...." (quoting *Reynolds & Reynolds Co. v. Norick*, 114 F.2d 278 (10th Cir.1940))).

Plaintiff's replicas are not likely to confuse potential purchasers. Plaintiff's vehicles display an "R" on the parking lenses and vent windows. No symbols or logos affiliated with Ferrari are displayed. Roberts informs all purchasers that his product is not affiliated with Ferrari. In light of these distinctions, and the high degree of customer care and sophistication that normally accompanies such a purchase—defendant's vehicles at issue sell for a minimum of $230,000, as well as the distinctly different marketing channels employed by the parties, I find the evidence insufficient to prove a likelihood of confusion by potential purchasers in the marketplace.

To be sure, some courts have expanded the application of the likelihood of confusion test to include individuals other than point-of-sale purchasers. These courts

have included potential purchasers who may contemplate a purchase in the future, reasoning that in the pre-sale context an "observer would identify the [product] with the [original manufacturer], and the [original manufacturer]'s reputation would suffer damage if the [product] appeared to be of poor quality." *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987); *see Mastercrafters Clock & Radio Co. v. Vacheron & Constantin–Le Coultre Watches, Inc.*, 221 F.2d 464 (2d Cir.), *cert. denied*, 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743 (1955); *Rolex Watch, U.S.A., Inc. v. Canner*, 645 F.Supp. 484 (S.D.Fla.1986).

In applying the test in this manner, these courts appear to recognize that the deception of a consumer under these circumstances could dissuade such a consumer from choosing to buy a particular product, thereby foreclosing the possibility of point-of-sale confusion but nevertheless injuring the consumer based on this confusion. The injury stems from the consumer's erroneous conclusion that the "original" product is poor quality based on his perception of a replica that he thinks is the original. These cases protect a potential purchaser against confusion as to the source of a particular product. Hence, even when expanding the scope of this test, these courts did not lose sight of the focus of section 43(a): the potential purchaser. The majority applies the likelihood of confusion test in a manner which departs from this focus.

The cases which have expanded the scope of the target group are distinguishable from the instant case, however. In *Rolex*, the counterfeit watches were labelled "RO-LEX" on their face. Similarly, the *Mastercrafters* court found that the clock was labelled in a manner that was not likely to come to the attention of an individual. It is also noteworthy that the Second Circuit has limited *Mastercrafters* "by pointing out that '[i]n that case there was abundant evidence of actual confusion, palming off and an intent to deceive.'" *Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 310 n. 8 (2d Cir.1972) (quoting *Norwich*

*Pharmacal Co. v. Sterling Drug, Inc.*, 271 F.2d 569 (2d Cir.1959), *cert. denied*, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960)). No evidence was introduced in the instant case to show actual confusion, palming off or an intent to deceive and, as previously noted, plaintiff does not use any name or logo affiliated with Ferrari on its replicas.

Further, these cases conclude that the proper remedy is to require identification of the source of the replica, not prohibit copying of the product. *See West Point*, 222 F.2d at 589 (stating that under such circumstances "the only obligation of the copier is to identify its product lest the public be mistaken into believing that it was made by the prior patentee"); *see also Coach Leatherware*, 933 F.2d at 173 (Winter, J., dissenting in part) (stating that "[a copier] thus has every right to copy [a product] so long as consumers know they are buying [the copied product]"). Accordingly, even if I were to conclude that plaintiff's copies created confusion in the pre-sale context, I would tailor the remedy to protect only against such confusion; this would best be accomplished through adequate labelling. The majority's remedy goes well beyond protection of consumers against confusion as to a product's source. It protects the design itself from being copied. *See supra* at 1239.

In sum, the relevant focus of the eight-factor test should be upon potential purchasers in the marketplace. Plaintiff's replicas present no likelihood of confusion because plaintiff provides adequate labelling so as to prevent potential purchasers, whether in the pre-sale or point-of-sale context, from confusing its replicas with Ferrari's automobiles. The majority errs by expanding the target group to include the "public," an expansion unsupported by the language and purpose of the Lanham Act. To the extent that the majority expands the target group, the test increasingly protects the design from replication and the producer from dilution, rather than the potential purchaser from confusion.[1]

---

**1.** I also note that the survey relied upon by the majority to prove a likelihood of confusion is

fatally flawed. Generally, "[i]n assessing the likelihood of confusion, a court's concern is 'the

The majority does more than implicitly recognize a dilution cause of action by its misapplication of the eight-factor test; it expressly reads such a cause of action into the statute. To justify this interpretation, the majority points out that Congress deleted the word "purchasers" from the statutory language in 1967. According to the majority, this congressional act demonstrates that Congress intended "to protect against the cheapening and dilution of the genuine product, and to protect the manufacturer's reputation." I fail to see how this one congressional act leads to such a conclusion.

As an initial matter, the majority's method of reasoning should compel it to reach a different conclusion. In 1989, Congress specifically considered and rejected adding an anti-dilution provision to the Lanham Act.[2] This action, it can be asserted, demonstrates that Congress does not now consider the protection of the Lanham Act to encompass injuries to a manufacturer based on dilution. The majority cannot look to one action of Congress to bolster its position, but ignore other actions which undercut its position.

More importantly, the language of the Lanham Act does not afford such protection to producers of goods. As noted in the previous section, the Lanham Act's protection runs to relevant consumers in the marketplace; its protection to producers is incidental to this primary protection. Requiring adequate labelling ensures that a producer will not have the poor quality of a replica imputed to its product by a confused potential purchaser. This is the only benefit accruing to a producer. Trademark dilution is not a cause of action under the Lanham Act. *See Eveready Battery Co. v. Adolph Coors Co.*, 765 F.Supp. 440 (N.D.Ill.1991).

Based on this reasoning, the majority enforces an injunction that goes far beyond the protection granted by the Lanham Act. Among other things, the injunction prohibits plaintiff from "manufacturing, or selling, or distributing ... the Miami Spyder and the Miami Coupe *and all versions thereof,* including but not limited to their exterior shapes and features...." (Emphasis added). The injunction prohibits the copying of defendant's design, rather than tailoring its protection to address the statutory danger—confusion of potential purchasers as to the source of a product. The appropriate remedy is not to prohibit the copying of a particular article, but to require adequate identification. The language of the injunction prohibits defendant from selling a car with the design of a Miami Spyder or Miami Coupe regardless of whether he adequately labels his product. For example, plaintiff would violate the injunction if he were to produce a car with a design identical to one of Ferrari's designs, and which had inscribed on each door and the hood in block letters, "Made

___

performance of the marks in the commercial context.'" *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1106 (6th Cir.1991) (quoting *Frisch's Restaurants, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1266 (6th Cir. 1985)). "It is the overall impression of the mark, not an individual feature, that counts." *Id.* at 1109. Applied to the instant case, this means that the analysis must be based on the products as they appear in the marketplace. The ultimate question is "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Id.* at 1107.

The survey lacks any probative value on the issue of consumer confusion because of the manner in which it was conducted. The survey was conducted by showing photographs of Ferrari's cars and Roberts' replicas *stripped of their identifying badges.* By conducting the survey in this manner, no assessment could be made of the likelihood of confusion in the "commercial context." Purchasers of plaintiff's cars are not purchasing from photographs. Accordingly, the survey is meaningless as to the likelihood of confusion.

**2.** The most recent amendment to the Lanham Act, the Trademark Law Revision Act of 1988, Pub.L. No. 100–667, 102 Stat. 3935 (1988) (effective Nov. 16, 1989), as originally introduced in both houses of Congress, permitted separate causes of action for dilution, disparagement and tarnishment. All of these provisions were deleted from the legislation which eventually was enacted. House Rep. 100–1028 (Oct. 3, 1988), *reprinted in* United States Trademark Ass'n, The Trademark Law Revision Act of 1988, The Legislative History, Reports, Testimony, and Annotated Statutory Text 277, 278 (1989); Cong.Rec. H10411, H10421 (Oct. 19, 1988).

by Roberts. Not associated in any way with Ferrari."

The Second Circuit recently reviewed an injunction prohibiting a defendant from copying any of plaintiff's handbags. *Coach Leatherware*, 933 F.2d at 171. Concerned "that the grant of such broad relief chills competition excessively," the Court stated:

[Plaintiff] produces from fifty to sixty different styles of handbags in various shapes and sizes. Though the scope of the injunction may reflect the court's desire to conserve judicial resources and stem relitigation of substantially similar infringement claims, we are skeptical that [plaintiff] could produce evidence sufficient to support such sweeping protection for its entire line of handbags. An extensive injunction prohibiting emulation of all types of [plaintiff's bags] could have the unacceptable effect of removing non-infringing design innovations from the market.

*Id.* at 24–25.

I find no support in the statutory language or legislative history of the Lanham Act for the broad protection granted by the instant injunction.

## II. The Sears–Compco–Bonito Boats Trilogy

The majority does not address this line of cases because it determines that federal trademark laws and federal patent laws are premised upon entirely different and mutually exclusive interests and objectives. It holds that no interrelationship exists between these laws; the availability of design patent protection does not preclude availability of Lanham Act protection. Thus, the majority concludes that this line of cases—*Sears*, *Compco* and *Bonito Boats*—has no relevance to federal trademark laws.

In both *Sears* and *Compco*, the Supreme Court considered whether a state's unfair competition statute impermissibly infringed upon federal patent laws by imposing liability for copying a product which was not protected by a federal patent. *Sears*, 376 U.S. at 225, 84 S.Ct. at 784; *Compco*, 376 U.S. at 234, 84 S.Ct. at 779. In *Sears*, a company copied a pole lamp design and did not affix an identifying label on the lamp itself. In *Compco*, defendant sold lighting fixtures almost identical to plaintiff's design. In both cases, the district court found that the designs had acquired secondary meaning and the copies created a likelihood of confusion.

Notwithstanding these conclusions, the Supreme Court reversed the lower courts and concluded that "[a]n unpatentable article, like an article on which the patent has expired, is in the public domain and may be made and sold by whoever chooses to do so." *Sears*, 376 U.S. at 231, 84 S.Ct. at 789. The Court reasoned that "[t]o forbid copying would interfere with the federal policy, found in Art. I, § 8, cl. 8, of the Constitution and in the implementing federal statutes, of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain." *Compco*, 234 U.S. at 237, 84 S.Ct. at 782. The Court did provide one caveat to its holding:

[A] state may, in appropriate circumstances, require that goods, whether patented or unpatented, be labeled or that other precautionary steps be taken to prevent customers from being misled *as to the source*, just as it may protect businesses in the use of their trademarks, labels, or distinctive dress in the packaging of goods so as to prevent others, by imitating such markings, from misleading *purchasers* as to the source of the goods.

*Sears*, 376 U.S. at 232, 84 S.Ct. at 789 (emphasis added).

The rationale of these cases was recently reaffirmed in *Bonito Boats*. There the Court struck down a state's unfair competition statute prohibiting the use of a particular molding process, plug molding, to duplicate any vessel hull or component parts of a vessel made by another person without the written permission of that other person. The Court struck down this statute and concluded that a state may not substantially interfere with or offer patent-like protection to an unpatented or utilitarian or design conception because it impermissibly

impinges on federal patent policy. *Id.* 489 U.S. at 156, 109 S.Ct. at 980.

I conclude that these cases are directly relevant to the issue at hand. While the purposes of the Lanham Act and federal patent laws are not identical, I nonetheless find some overlap and congruity of purpose among these laws. Both the Lanham Act and federal patent laws affect commercial activity, particularly in the area of design patents. Patent laws confer a monopoly of limited duration upon the holder of the patent; this directly affects the marketplace. Similarly, the Lanham Act protects against certain unfair trade practices including a likelihood of confusion among potential purchasers. It is simply inaccurate to say that trademark law affects commercial activity and patent law affects private activity.

Moreover, the Supreme Court in *Sears, Compco* and *Bonito Boats* states unequivocally that an interrelationship exists between unfair competition laws and federal patent laws. The statutes at issue in *Sears, Compco,* and *Bonito Boats* were state unfair competition statutes similar to the Lanham Act in their purpose and objectives. By holding that these statutes conflicted with federal patent laws, the Supreme Court implicitly rejected the distinction urged by the majority. Hence, the rationale applied in this trilogy of cases to state unfair competition laws applies with equal force to federal trademark laws.

In sum, the criteria used by the majority to determine the availability and scope of protection by the Lanham Act for unpatented designs—an overly broad "likelihood of confusion" test and an anti-dilution theory—enlarge the Lanham Act's scope of protection beyond its statutory language and congressional intent, and result in an injunction that runs afoul of the Supreme Court's holdings in *Sears, Compco* and *Bonito Boats.* Congress intended that the rights in a design should expire with their design patent. The effect of the majority's holding is to give Ferrari the equivalent of a design patent in perpetuity.

### III.

Based on these errors, I would reverse and remand this case in order that the District Court could properly apply the eight-factor test used to determine the likelihood of confusion vis-a-vis potential purchasers.