76 F.3d 380
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
WINDMILL CORP. d/b/a Martha White Foods, Plaintiff,
Appellee, Cross-Appellants,
v.
KELLY FOODS CORP.; JRB Foods, Inc., Defendants, Appellants,
Cross-Appellees.
 Nos. 94-5874, 94-5890, 95-5137.
 United States Court of Appeals, Sixth Circuit.
 Jan. 26, 1996.
 
 Before: MARTIN and JONES, Circuit Judges; and BELL, District Judge[1].
 PER CURIAM.
 
 
 1
 Before this court is defendant/appellant Kelly Foods Corporation's (Kelly) appeal and plaintiff/cross-appellant Windmill Corporation d/b/a Martha White Food's (Windmill) appeal from an order permanently enjoining Kelly from producing, marketing, selling or distributing "Catty Shack" cat treat products in its current trade dress. The issues before us as raised by Kelly are as follows: whether (1) the "Bonkers" trade dress has acquired a distinctive or secondary meaning?; (2) there is a likelihood of confusion among consumers as to the origin of "Catty Shack" cat treat product?; (3) Kelly was granted an implied license to package its cat treat product in a four-ounce milk carton?; and (4) the language of the permanent injunction issued against Kelly meets the specificity requirement of Federal Rule of Civil Procedure 65(d)? Windmill would have us consider whether the district court erred as a matter of law in finding that the shape of the "Bonkers" package is functional? For the reasons that follow, we affirm the district court.
 
 I.
 
 2
 Windmill or one of its predecessors in interest has distributed "Bonkers" cat treats in four-ounce gable-top (milk carton) containers since 1984. Under a real property purchase agreement dated October 20, 1987, Kelly purchased a Berlin, Maryland, pet food manufacturing facility, including real and personal property from Pet Specialties, Inc., a division of Beatrice Foods, one of Windmill's predecessors. Among the personal property sold was a PURE-PAK packaging machine that was used to package dog and cat foods in four-ounce milk cartons.
 
 
 3
 Pursuant to a one-year agreement also dated October 20, 1987, Kelly packaged the "Bonkers" product for Windmill at Kelly's plant in Berlin, Maryland. The packaging agreement provided that "[n]othing herein shall be deemed to give [Kelly] any claim or right in the labels or in the trademarks of [Windmill]." A non-disclosure agreement executed on January 11, 1989, provided as follows:
 
 
 4
 Notwithstanding anything to the contrary set forth above, [Windmill] hereby acknowledges that it has previously contracted with [Kelly] for the production of Bonkers. [Windmill] further acknowledges that [Kelly] has an equal interest in the formulas for Bonkers. As a result of the foregoing, [Windmill] agrees that this letter shall not be applicable to the formulas for Bonkers nor the manufacturing techniques, processes, know how and trade secrets utilized by [Kelly] in the production thereof, nor shall it be construed to preclude [Kelly] from producing or selling cat treats under the same or a different formula under a name other than Bonkers. (Emphasis added.)
 
 
 5
 After the agreement expired, Kelly continued to package "Bonkers" on a month-to-month basis until October 1992. Kelly made an informal offer of approximately one million dollars to Windmill for the name "Bonkers." Windmill rejected the offer. Ralston Purina offered in excess of three million dollars. On June 18, 1992, Kelly began to market its "Catty Shack" cat treat product, which is also sold in four-ounce milk cartons, and includes features that are similar to the "Bonkers" milk carton. Besides the color and shape of the carton, these similarities include the color codes, the location and font of the color designations, and the positioning and color of the phrase "cat treat." Robert Kelly, President of Kelly, testified that Lana Kennedy, designer of the "Catty Shack" package, had "Bonkers" containers in her possession in the final stages of the design process. This, Kelly asserted, was to ensure that the "Catty Shack" packages were not "exact" in color to the "Bonkers" packages. On August 14, 1992, Kelly gave notice to Windmill that it was going to cease packaging "Bonkers" as of October 1, 1992.
 
 
 6
 Prior to the sale of "Catty Shack," "Bonkers" was the only cat treat sold in the United States with a four-ounce gable-top container.[2] According to Kelly, the function served by the milk carton container does not dictate the shape of the container. Windmill contends that the four-ounce milk carton container facilitates filling the container in the production process, and allows the consumer to reseal the carton. Other forms of packaging are less expensive. Windmill considered, on more than one occasion, changing its packaging to a lower cost option but declined to do so because of an association by consumers of "Bonkers" with the shape of its container.
 
 
 7
 Bil-Jac Foods, a Kelly affiliate, has been packaging pet foods in milk cartons since the early 1960s. Further, "Taniami" and "Eukanuba" dog food have been packaged in milk cartons since at least the 1970s. Bil-Jac distributes trial sizes of puppy food, cat food, dog food and liver treats in four ounce milk cartons. In addition, the Kit Cat Glow cat food by Wayne TM, the IAMS' cat and kitten foods, as well as Purina TM Kitten Chow TM are sold in milk carton containers of varying sizes. One firm sells dog and puppy foods in half-gallon milk carton containers. The district court found that competing brands of cat treats as well as dog treats offered similar color schemes for comparable product lines. Background colors are used to designate flavor of food in the pet food industry.
 
 
 8
 Windmill conducted a consumer survey among 99 cat owners who purchase cat treats at least once per year. The cat owners were asked whether they had seen cat treats packaged in small milk-type cartons. Seventy-six percent responded affirmatively. Among these 75 people, 32 percent cited "Bonkers" as a cat treat packaged in a milk carton container. When the remaining respondents were prompted that "Bonkers," along with four other brands, is a brand of cat treats, 39 percent identified it as a cat treat packaged in a milk-type carton. The survey concludes (by combining the two percentages) that 71 percent of the survey respondents associate "Bonkers" with a milk-type carton. Actually, of the original 99 cat owner-respondents, only 24 were able to link "Bonkers" with the milk-carton package and an additional 20 were able to do so after being prompted with five brands. Therefore, only about 24 percent associated "Bonkers," without prompting, with a milk-type carton. The percentage rises to only 44 percent with prompting. The district court accepted the survey conclusion (71%) as evidence that the "Bonkers" packaging had a distinctive, secondary meaning in the marketplace.
 
 II.
 
 9
 15 U.S.C. § 1125(a)(1) (the Lanham Act) provides in pertinent part:
 
 
 10
 Any person who, on or in connection with any ... container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin ... which is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin ... of his or her goods ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
 
 
 11
 This section has been construed to protect the "trade dress"[3] of a product under the same principles that protect registered trademarks. Two Pesos, Inc., v. Taco Cabana, Inc., 505 U.S. ----, 120 L.Ed.2d 615, 623 (1992). Trade dress is classified in categories of generally increasing distinctiveness. A dress may be "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." Id. (quoting Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir.1976)). The latter three categories, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and entitled to protection. The first two categories may become distinctive when either acquires a secondary meaning in the marketplace. Id. at 624. Secondary meaning is used generally to indicate that a dress has come through use to be uniquely associated with a specific source. Id. at 622 n. 4. Nonfunctionality and proof of a likelihood of confusion are, also, a prerequisite for protection. Id. at 624. Thus, to sustain a claim for trade dress infringement, a plaintiff must prove that the allegedly misappropriated features of the dress (1) are inherently distinctive or have acquired distinction by virtue of secondary meaning in the marketplace; (2) are not functional; and (3) create a likelihood of confusion as to the source of defendant's goods.
 
 III.
 
 12
 Kelly argues that it was granted an implied license to package its cat treat product in a four-ounce milk carton. Due to the language of the one-year co-packing agreement (executed the same day as the purchase agreement wherein Kelly acquired Windmill's packaging machine) that "[n]othing herein shall be deemed to give [Kelly] any claim or right in the labels or in the trademarks of [Windmill]," the district court found Kelly had not been granted an implied license to sell its cat food in a four-ounce milk carton. Assuming that a four-ounce milk carton is a trademark of Windmill, the language quoted precludes any implication that Kelly was receiving a license to sell its own cat treats in a four-ounce milk carton. Kelly's argument that it defies common sense for a company to purchase such a large expensive piece of equipment for the benefit of a one-year agreement is immaterial. One's business judgment or lack thereof cannot eviscerate the unambiguous language of their co-packing agreement entered into the same day as the purchase agreement.
 
 IV.
 
 13
 Answering the question, whether a four-ounce milk carton is a trademark of Windmill, can be determined at a threshold level if the container is functional.
 
 
 14
 [A] design is legally functionable, and thus unprotectable, if it is one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection. This serves to assure that competition will not be stifled by the exhaustion of a limited number of trade dresses.
 
 
 15
 Two Pesos, 120 L.Ed.2d at 627-28. Expanding on this standard, "[a] product feature is functional 'if it is essential to the use or purpose of the article or if it effects the cost or quality of the article.' " Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts, 944 F.2d 1235, 1246 (6th Cir.1991) (citation omitted). In addition, "a functional feature is one which competitors would have to spend money not to copy but to design around." Someday Baby, Inc., JTG of Nashville, Inc., 744 F.Supp. 811, 813 (M.D.Tenn.1990).
 
 
 16
 The magistrate judge concluded that the four-ounce milk carton was legally functionable and could not be protected. This conclusion was supported by the milk carton being one of several types of containers available, and by it serving the function of resealability, which makes the cat treat attractive to consumers who use it over time as well as affecting the quality and cost of the product. In addition, given Kelly's milk carton packaging machine at its Berlin, Maryland, plant, Kelly would have to spend money to design around the milk carton. The district judge noted that the many pet food and non-pet food consumer products today that are packaged in milk cartons lend to the conclusion that milk-type cartons serve functionality. The district judge, also, recognized the utilitarian features of milk cartons that are absent from alternatives. Some of these features are described in the presumably expired United States Letters Patent No. 2,750,095, issued on June 12, 1956. (App. at 595). These are ample reasons to find functionality under a clearly erroneous standard of review. Fed.R.Civ.P. 52(a).
 
 V.
 
 17
 "To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, 'That is the article I want because I know its source,' and not the negative inquiry as to 'Who makes that article?' In other words, the article must proclaim its identification with its source, and not simply stimulate inquiry about it." Roberts, 944 F.2d at 1239. The magistrate judge concluded that "Bonkers" has acquired a distinctive and secondary meaning for the following reasons: (1) the multi-million dollar offers for the "Bonkers" tradename; (2) "Bonkers" is the market leader in the cat treat industry[4]; (3) the consumer survey results; and (4) Windmill's obvious copying of "Bonkers" overall appearance. Each reason will be addressed.
 
 
 18
 A. Relevance of the multi-million dollar offers
 
 
 19
 As the nondisclosure agreement indicates, Kelly already had the rights to the "Bonkers" formula. Its one million dollar offer was, therefore, only for the name "Bonkers." That there were multi-million dollar offers, Ralston Purina being willing to offer $3.5 to 4 million dollars for the rights to "Bonkers Cat Treats," not merely for the name "Bonkers" as the magistrate judge concluded, does not tell the court what the trade dress was worth to others, if it was worth anything at all. A finding of secondary meaning does not, however, turn on this point.
 
 B. Relevance of being a market leader
 
 20
 "Bonkers" was second (not first as the magistrate concluded and as plaintiff conscientiously noted) in sales in the cat treat industry. The evidence relied upon by the magistrate was an October 7, 1988, offering memorandum wherein it indicated that "Bonkers" had a 22.3 percent market share during the previous year. This figure (which appears to be rather low for the purposes for which it was offered into evidence) tells the court nothing about its market share at the time of the complaint in November 1992, and certainly nothing about whether its trade dress had a secondary meaning in the marketplace. Nonetheless, this fact is, also, not integral to a finding of secondary meaning.
 
 C. Relevance of consumer survey
 
 21
 The consumer survey does not tell the court as much as the magistrate judge would like to see. Of those small number participating in the survey (99), only about 24 percent associated "Bonkers," without prompting, with a milk-type carton. The percentage rises to only 44 percent with prompting. In Spraying Systems Co. v. Delaven, Inc., 762 F.Supp. 772, 779 n. 6 (N.D.Ill.1991), the court noted that "in order to prove secondary meaning a "substantial" portion of buyers clearly sufficient to that end, while a 38% figure would have been marginal even in a properly designed survey." Neither 24 or 44 percent seem to be that high so as to indicate a distinctive or secondary meaning in the marketplace. Moreover, this survey does not go to the distinctiveness or secondary meaning in the market place of the "Bonkers" non-functional trade dress. It only addresses the survey participants' identification of the name, "Bonkers," with a milk carton container, the latter not being protected because of its functionality. The survey does not address the other characteristics of its trade dress. Again, however, secondary meaning can still be found.
 
 
 22
 D. Kelly's copying of "Bonkers' " overall appearance
 
 
 23
 Under Roberts, 944 F.2d at 1242-43, relied upon by the magistrate,
 
 
 24
 "[The] intent of [a party] in adopting [another's mark] is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of [the plaintiff,] that fact alone may be sufficient to justify the inference that there is confusing similarity." (Citation omitted.)
 
 
 25
 The magistrate concluded that Windmill intended to copy "Bonkers' " overall appearance by virtue of its "package form and background colors, the display of wording, the titles of the flavors and the use of cat figures similar to the "Bonkers" original design...." In addition, the magistrate pointed to Kelly's obvious knowledge of the volume of "Bonkers' " business, its long history of producing "Bonkers" and the access of Kelly's designer to the "Bonkers" treat, to reach the conclusion that Kelly had intentionally copied the "Bonkers" trade dress. These findings are sustainable under a clearly erroneous standard of review to find intentional copying and, thus, sufficient to uphold a presumption that "Bonkers" has acquired secondary meaning. See id. at 1239.
 
 VI.
 
 26
 Under Kwik-Site Corp. v. Clear View Mfg. Co., 758 F.2d 167, 178 (6th Cir.1985), seven factors can be considered in determining a likelihood of confusion: "(1) degree of similarity (of the trade dress or product configuration); (2) similarity of goods or services for which the marks are used; (3) area and manner of concurrent use; (4) strength of the mark; (5) sophistication of purchasers; (6) plaintiff's intent; and (7) actual confusion." Actual confusion need not be proven. Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1190 (6th Cir.1991). Using these standards, the magistrate judge concluded that confusion was likely because of the similarity of the package form and background colors, the display of the wording, the titles of the flavors and the use of the cat figures similar to the "Bonkers" original design. The district judge added, "One need only look briefly at the actual Catty Shack and Bonkers packages to see that they are confusingly similar." We agree. A "side-by-side examination or comparison," Mihalek Corp. v. State of Michigan, 814 F.2d 290, 297 (6th Cir.1987), leads us to conclude that the ordinary purchaser would be confused as to the source of origin.
 
 
 27
 It is so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them. The law is not made for the protection of experts, but for the public--that vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions.
 
 
 28
 Florence Mfg. Co. v. J.C. Dowd & Co., 178 F. 73, 75 (2d Cir.1910); accord Hemmeter Cigar Co. v. Congress Cigar Co., 118 F.2d 64, 70 (6th Cir.1941).
 
 VII.
 
 29
 Finally, Kelly argues that the language of the permanent injunction issued against it fails to meet the specificity requirement of Fed.R.Civ.P. 65(d). The district court enjoined Kelly "from producing, marketing, offering for sale, selling, or distributing "Catty Shack" cat treat products in its current trade dress and in any other that is not substantially different from the Bonkers trade dress." The parties are currently involved in contempt proceedings based on Kelly's redesigned packaging. Federal Rule of Civil Procedure 65(d) requires that "[e]very order granting an injunction ... shall be specific in terms; shall describe in reasonable detail ... the act or acts sought to be restrained." "But the Rule does not require the impossible. There is a limit to what words can convey. The more specific the order, the more opportunities for evasion ("loopholes")." Scandia Down Corp. v. Euroquilt, Inc., 772 F.2d 1423, 1431 (7th Cir.1986). Thus, an injunction against "any colorable imitation" satisfied the rule. Id. at 1432. In Wynn, 943 F.2d at 609, this circuit affirmed an injunction prohibiting the defendants from using a mark "confusingly similar" to the plaintiff's mark. The district court's "not substantially different" language is as clear as Wynn's "confusingly similar" language or Euroquilt's "any colorable imitation."
 
 
 30
 Kelly knows what it cannot imitate. The district court indicated in its opinion the areas of infringement by its adoption of the magistrate's report and recommendation which addressed the same: "In addition to package form and background colors, the display of wording, the titles of the flavors and the use of cat figures similar to the "Bonkers" original design are factors that are likely to lead to confusion." Mag.Rep. & Rec. at 19. The district court cannot be expected to redesign defendant's packaging for it. That the parties are involved in contempt proceedings adds no weight to defendant's argument. The text of the injunction (though surely capable of being more specific), read in the context of the magistrate's report and recommendation, is sufficient to enlighten Kelly concerning what is forbidden, and is not clearly erroneous. "Rule 65(d) does not require a torrent of words when more words would not produce enlightenment about what is forbidden." Euroquilt at 1432.
 
 
 31
 Finding no clear error below, we AFFIRM the judgment of the district court.
 
 
 
 [1]
 The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [2]
 Apparently, a Canadian cat treat named "Trixie" has a similar container, but the magistrate judge found, contrary to Kelly's proofs, that it had not been sold in the United States
 
 
 [3]
 "The 'trade dress' of a product is essentially its total image and overall appearance." "It 'involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques' " Two Pesos, 120 L.Ed.2d at 621 n. 1 (citations omitted)
 
 
 [4]
 Windmill noted, in its brief, the magistrate judge's error in ranking "Bonkers" first in the cat treat market. "Bonkers," according to a December 1988 Offering Memorandum, is the second leading seller in the cat treat market. (Brief at 27 n. 9)