DAP PRODUCTS, INC., Plaintiff,

v.

COLOR TILE MANUFACTURING, INC.,
dba North American Adhesive and
Coating Company, Defendant.

No. C–3–92–344.

United States District Court,
S.D. Ohio, W.D.

April 20, 1993.

Thomas W. Flynn, Biebel & French, Dayton, OH, for plaintiff.

Thomas S. Calder, Dinsmore & Shohl, Cincinnati, OH, Robert A. Felsman, Felsman, Bradley, Gunter & Dillon, Fort Worth, TX, for defendant.

## DECISION AND ENTRY GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

MERZ, United States Magistrate Judge.

This case is before the Court on Plaintiff DAP Products Inc.'s ("DAP") Motion for

Preliminary Injunction. (Doc. 2). This Court held a hearing on the matter on October 26, 1992, (Doc. 21, 22), the parties have fully briefed the issues, (Doc. 2, 15, 20, 23, 25, 38, 40, 42, 44), and the matter is now ripe for decision.

The parties have unanimously consented to full magistrate judge authority under 28 U.S.C. § 636(c) (Doc. # 11).

The Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) are embodied in the following opinion.

DAP is the successor to the business of Durabond Products Company, a division of USG Industries, Inc. ("Durabond"). DAP formulates, manufactures, packages, and sells a variety of adhesives, grouts, mastics, coatings, and caulkings. It sells these products through distributors to contractors, such as tile installers. It also sells to individuals and homeowners through retail hardware and home improvement outlets.

In 1978, Durabond introduced a mastic for installation of interior wall, floor, and countertop ceramic tiles. Durabond claimed that its product was the first non-flammable, freeze-thaw stable, water-based tile mastic specifically designed to meet the requirements of the American National Standard Institute's specifications for Type I ceramic tile mastic. The product was identified as product No. 2001 ("2001").

Durabond sold 2001 primarily through distributors to contractors and professional tile installers, and offered it in different sized containers, including quarts, gallons, 2 gallon containers, and 3½ gallon buckets. A major portion of 2001 sales were in the 3½ gallon buckets. When Durabond initially introduced 2001 in the 3½ gallon bucket, it was packaged in a generic bucket made of either white or black plastic and it was marketed in competition with 3½ gallon buckets of tile mastic sold by other companies.

In 1981, Durabond decided to provide a distinctive appearance for 2001, and it began packaging it in a red 3½ gallon bucket. At that time, no other mastic product was packaged in a 3½ gallon red bucket. Durabond began nationwide use of the red bucket in late 1982, or early 1983. DAP continues to use the red bucket for 2001.

In 1981, Durabond's northeastern representative for sales in the States of Connecticut, Maryland, Massachusetts, New Jersey, New York, Pennsylvania, and northern Virginia was K–Sales Co. which participated in the test marketing of the red bucket. William Greer ("Greer") and his wife are the only employees of K–Sales. In 1989, DAP decided to use an in-house sales team, and in the fall of 1989, DAP notified K–Sales that it no longer needed its services. DAP terminated K–Sales as its manufacturer's representative effective January 1, 1990.

During the period of the fall of 1989, to January 1, 1990, Greer took several orders from DAP customers for adhesives and some of these orders were for "private label" brands. Greer did not refer any of these orders to DAP although he was to represent DAP up until the termination date of January 1, 1990.

Defendant Color Tile Manufacturing, Inc. dba North American Adhesive and Coating Company ("Color Tile") manufactures a Type I mastic sold under the designation "2040". Color Tile does not advertise its 2040.

In November, 1989, Greer met with several representatives from Color Tile to discuss the possibility of having K–Sales act as Color Tile's sales representative. Color Tile eventually entered into an agreement with K–Sales, effective January 1, 1990. In January, 1990, Color Tile filled the pre-January 1, 1990, orders which DAP customers had placed with K–Sales.

On November 27, 1989, prior to the effective date of his termination as DAP's representative, Greer sent to Mr. Christensen, Color Tile's national sales manager, a memorandum suggesting a label for Color Tile's Type I mastic. Greer's proposal was a label in which the digits "2" and "1" were separated by an intertwining three-ring logo. Greer's proposal also included using a red bucket with a white lid. Subsequently, Mr. Christensen sent a memo to an employee in Color Tile's advertising department which included the sentence: "The objective is to

make NA 21 look like 2001." (emphasis in original).

Greer instructed Color Tile to package all its adhesive products for the customers he served in red buckets unless the customer requested otherwise. Greer testified he wanted to provide a red, white, and blue "Made in America" look for 2040. At the time K–Sales and Color Tile became associated, Robert Protho ("Protho"), the general manager of Color Tile's adhesive plant in West Chicago, was not aware of any other Type I mastic which was packaged in a red bucket.

Greer's sales efforts on behalf of Color Tile included "private label" sales to distributors where Color Tile's 2040 was packaged in a red bucket with the distributor's name on the label. Most of Greer's private label customers for the 3½ gallon bucket of Type I mastic were also his customers when he was DAP's sales representative. The private label products packaged in a red bucket for Greer's customers do not contain any indication of the identity of the manufacturer or the place where the product was manufactured, so consumers would not know whose product was in the red bucket. Prior to January, 1990, Color Tile did not package 2040 in a red bucket, but rather used either white or black buckets. The only reason Color Tile began using the red bucket was because Greer requested it, but Color Tile does not provide 2040 in a 3½ gallon red buckets to·any of its customers other than those whom Greer services. When Color Tile did begin packaging its 2040 in a 3½ gallon red bucket, the sales of 2040 increased.

Red buckets are more expensive than white or black buckets and the 3½ gallon size bucket is the primary container which contractors and professionals purchase.

Sometime in 1990, Kenneth Knudtzon ("Knudtzon"), one of DAP's marketing employees, learned that Color Tile was selling Type I mastic in red 3½ gallon buckets in the Northeast area of the country. DAP's in-house counsel, Randolph Tormey ("Tormey") was notified of this fact. Prior to being advised that Color Tile was selling Type I mastic in 3½ gallon red buckets, Knudtzon

was not aware of any of DAP's other competitors using 3½ gallon red buckets.

Sometime after Color Tile's 3½ gallon red bucket arrived in the marketplace, two other adhesive manufacturers, Laticrete and Bonsal, began offering mastic in a red bucket. However, Laticrete's products were unsuccessful and were removed from the market. Recently, two other manufacturers, Hydroment and Supertek, have introduced mastic in red buckets. The buckets these other adhesive manufacturers used were manufactured in 1989, 1990, and 1991; obviously they could not have been filled and labeled until sometime after their manufacturing date.

In early 1990, USG Corp., DAP's predecessor, began receiving reports from the field that Greer was selling Color Tile's Type I mastic in 3½ gallon red buckets. The early reports indicated that the sales were limited in nature, both in quantities and in the geographic area involved, which consisted primarily of New York and New Jersey.

During this same period of time, USG had successfully withstood a hostile take-over attempt. These particular activities had resulted in a substantial drain on the company's resources and to compensate for this, USG began reviewing its assets to see which of those assets it could·sell in order to improve its financial health. USG eventually decided to sell off DAP.

DAP's only in-house counsel was Mr. Tormey and he learned of the proposed DAP sale in late 1990. The actual sale of DAP occurred in September, 1991, and between late 1990, and the time of the sale, most of Tormey's time and attention were devoted to the sale process. Following the sale of DAP, Tormey's time and attention, as well as that of DAP's senior management personnel, were focused on how and by whom DAP would be managed. Tormey did not learn until early 1992 that DAP would keep him as its in-house counsel.

DAP·began receiving more reports from the field that other competitors were beginning to market Type I mastic in 3½ gallon red buckets. It started an investigation to determine the extent of the red bucket marketing by other companies, and in August,

1992, turned the matter over to outside counsel. This action was filed on September 1, 1992.

On June 19, 1991, DAP filed a trademark application in the United States Patent and Trademark Office. That Office rejected the application in a December 6, 1991 Office Action, on the basis that the mark was a non-distinctive configuration of the container or packaging for the goods. The Office Action also requested that DAP submit new drawings or specimens. Subsequently, DAP's trademark counsel was advised by a Patent and Trademark Office examining attorney to provide a statement pertaining to the acquired distinctiveness of the mark. Counsel did so and also submitted a new drawing.

The red bucket trademark was published for purposes of opposition and none was received. The Patent and Trademark Office granted Registration No. 1,723,096 as announced on October 13, 1992.

The Sixth Circuit has enunciated four elements which must be considered and "carefully balanced" in deciding to issue or withhold a preliminary injunction. *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1263 (6th Cir.1985) (citation omitted) (*"Frisch's "*). These factors are:

1. whether the movant has shown a strong or substantial likelihood or probability of success on the merits;
2. whether the movant has shown irreparable injury;
3. whether the preliminary injunction could harm third parties; and
4. whether the public interest would be served by issuing the preliminary injunction.

*Frisch's, supra.* (citations omitted). *See also NAACP v. City of Mansfield*, 866 F.2d 162, 166 (6th Cir.1989); *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir.1985).

These criteria "do not establish a rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief". *Frisch's, supra.* (citation omitted). The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met. *Id.* (citations omitted).

## I. Likelihood of success on the merits

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), creates a civil cause of action for trademark infringement. § 43(a) of the Act provides in relevant part:

Any person who, or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...

．　　．　　．　　．　　．

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

As an initial matter, this Court notes that DAP holds United States Trademark Registration No. 1,723,096 for its 3½ gallon red bucket. The Lanham Act provides:

### § 1057. Certificate of registration

．　　．　　．　　．　　．

### (b) Certificate as prima facie evidence

A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate subject to any conditions or limitations stated in the certificate.

15 U.S.C. § 1057.

However, because Color Tile has challenged the validity of DAP's trademark, for purposes of the present motion, this Court

will analyze this matter as if DAP did not hold Trademark Registration No. 1,723,096.

The protection against infringement provided by § 43(a) is not limited to "goods, services or commercial activities" protected by registered trademarks. *Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts,* 944 F.2d 1235, 1238 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992). It extends as well, in certain circumstances, to the "trade dress" of an article. *See, Id.* "Trade dress" refers to "the image and overall appearance of a product." *Id.* at 1238–39 (citation omitted). It embodies "that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, intended to make the source of the product distinguishable from another and to promote its sale." *Id., quoting, Mr. Gasket Co. v. Travis,* 35 Ohio App.2d 65, 72 n. 13, 299 N.E.2d 906, 912 n. 13 (1973).

To be successful on the merits of its claim that Color Tile has violated § 43(a), DAP's burden will be to show by a preponderance of the evidence:

1. that the trade dress of its Type I mastic has acquired "secondary meaning";

2. that there is a likelihood of confusion based on the similarity between the trade dress of its product and Color Tile's product; and

3. that the appropriated features of DAP's trade dress are primarily non-functional.

*See, Esercizio,* 944 F.2d at 1239 (citation omitted).

### 1. Secondary meaning

As to the issue of secondary meaning, the rule is that in an action brought under 15 U.S.C. § 1125(a) for false designation of origin, a plaintiff ... need not prove that its product has acquired secondary meaning if it can prove that its product is inherently distinctive. *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992).

To acquire a secondary meaning in the minds of the buying public, an article of merchandise, when shown to a prospective customer, must prompt the affirmation, "This is the article I want because I know its source," and not the negative inquiry as to "Who makes that article?" *Id.* (citation omitted). In other words, the article must proclaim its identification with its source, and not simply stimulate inquiry about it. *Id.* (citation omitted).

As was the case in *Esercizio,* secondary meaning in this case can arguably be presumed from Color Tile's attempts to intentionally copy DAP's 3½ gallon red bucket trade dress. The Court infers this intent Greer's requesting that Color Tile package its product in 3½ gallon red buckets for his customers, unless the customers requested otherwise, and his suggestion that the logo for the bucket be designed so as to suggest "2001". Color Tile's intent to copy is further shown by Christensen's memo to the advertising department which stated that, "[t]he objective is to make NA21 look like 2001."

The evidence of intentional copying shows the strong secondary meaning of DAP's trade dress because there is no logical reason for the attempt at copying save an attempt to realize upon a secondary meaning that is in existence. *See, Esercizio,* 944 F.2d at 1239 (citation omitted).

### 2. Likelihood of confusion

In determining likelihood of confusion in a Lanham Act case, a court should consider the following factors: strength of the plaintiff's mark; relatedness of the goods; similarity of the marks; evidence of actual confusion; marketing channels used; likely degree of purchaser care; defendant's intent in selecting the mark; and likelihood of expansion of the product line. *Esercizio,* 944 F.2d at 1242, *citing, Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642 (6th Cir.), *cert. denied,* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982) ("*Elby's*"). A party claiming infringement need not show all, or even most of these factors in order to prevail. *Esercizio,* 944 F.2d at 1242, *citing, Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1186 (6th Cir.1988).

This Court finds that the strength of DAP's mark is strong. First, the evidence established that customers requested "the

red" bucket. Second, and perhaps more persuasive, is Color Tile's intentional effort to make its product "look like" DAP's product. This is strong circumstantial evidence of the distinctiveness of DAP's trade dress.

There is no dispute about the relatedness of the goods. The product produced by both DAP and Color Tile is Type I mastic.

The similarity of the trade dress is indisputable. Both DAP and Color Tile use the 3½ gallon red bucket.

As acknowledged by DAP, there was no evidence presented with respect to actual confusion.

DAP and Color Tile use the same marketing channels and, as noted above, Greer was DAP's sales representative immediately prior to becoming Color Tile's sales representative.

The likely degree of purchaser care is low. Although the contractors who use Type I mastic are sophisticated with respect to the skills required for laying tile, they rely on the distributors who sell them mastic to suggest what product to use.

Color Tile's intent in selecting the 3½ gallon red bucket was clearly an effort to make its product "look like 2001".

With respect to the likelihood of expansion of product lines, when goods are related, any expansion is likely to result in direct competition. The evidence establishes that Greer intends to sell a variety of related adhesives in red buckets.

The court in *Elby's, supra,* made it clear that the standard of proof needed to prevail in an action seeking injunctive relief for trademark infringement is a "likelihood of confusion". This Court finds that aside from the presumption of likelihood of confusion that follows Color Tile's intentional copying, the relevant *Elby's* factors weigh in favor of DAP with respect to the issue of likelihood of confusion.

### 3. Nonfunctionality of appropriated features

Trademark law does not protect the functional features of products because such pro-

tection would provide a perpetual monopoly of features which could not be patented. *Esercizio,* 944 F.2d at 1246 (citation omitted). A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Id., citing, Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2186 n. 10, 72 L.Ed.2d 606 (1982).

The 3½ gallon red bucket is clearly not a functional feature.[1] The bucket is not essential to the use or purpose of DAP's Type I mastic and it not does it affect the cost or quality of 2001. This conclusion is supported by the fact that Type I mastic is packaged in other types and colors of buckets. Further, while the 3½ gallon red bucket itself is more costly than white or black buckets, the red bucket does not affect the cost or quality of the Type I mastic itself.

Based on weighing of the relevant *Esercizio* and *Elby's* factors, this Court concludes that DAP has shown a substantial likelihood of success on the merits of its claim of infringement of its trade dress.

## II. Irreparable injury

A presumption of irreparable harm attaches once the moving party demonstrates probable success in proving likelihood of confusion. *International Kennel Club, Inc. v. Mighty Star, Inc.* 846 F.2d 1079 (7th Cir. 1988).

This Court has concluded that DAP has demonstrated probable success on the merits, particularly with respect to proving likelihood of confusion. *See, supra.* This Court concludes further that DAP will suffer irreparable injury if Color Tile is not enjoined from continued use of the 3½ gallon red bucket. Continued use by Color Tile of the red bucket will likely result in DAP's loss of its trademark rights, be they statutory or common law. Further, continued use by Color Tile of the 3½ gallon red bucket will also likely result in the purchasing public's inability to know if the Type I mastic it purchases, particularly the "private label" mastic, is

---

1. There are functional features to the bucket design: reinforcement ridges near the lip, the han-

dle, etc. None of these are peculiar to the particular buckets being used by either party.

DAP's product or Color Tile's product. The harm caused by loss of a trademark is, by its very nature, irreparable because once the trademark is lost, it is very unlikely that it can be regained.

### III. Harm to third parties

The third parties who could arguably be harmed by the issuance of a preliminary injunction are Mr. Greer and Color Tile's customers who purchase Type I mastic from him. However, this Court concludes that the harm, if any, that Mr. Greer or the customers he services would arguably suffer is minimal.

Mr. Greer does not purchase Color Tile's mastic for resale. Rather, he sells it for Color Tile. Therefore, he has no financial interest or investment in any of the inventory. Color Tile's customers will not have their access to, or supply of, Color Tile's Type I mastic interrupted. They will simply be supplied with the product in a different color container. Of course, any harm to Mr. Greer is largely invited, since it was he who convinced Color Tile to use the red bucket.

At this juncture, the Court notes that issuance of a preliminary injunction will result in Color Tile's having to either re-package or not offer for sale the Type I mastic which it presently has in stock in 3½ gallon red buckets. It may also have to dispose of its inventory of empty red buckets. However, when compared with the potential irreparable harm DAP faces in the loss of its trademark rights, the balance of hardships clearly weighs in favor of DAP. Further, if it is eventually determined that the preliminary injunction was wrongfully issued, Color Tile may arguably be reimbursed for any such damages it may have suffered as a result of the wrongful issuance by virtue of the bond which DAP will be required to post.

### IV. Public interest

This Court concludes that the public interest lies in the enforcement of trademark rights. The public also has an interest in knowing whose product it is purchasing.

Based on its analysis and weighing of the applicable *Frisch's* factors, this Court finds that DAP has met its burden of establishing its entitlement to a preliminary injunction.

In reaching this conclusion, the Court has carefully considered Color Tile's argument that the "color depletion" theory is applicable and that under that theory, color alone cannot be protected as a trademark. The color depletion theory assumes that new competitors would be precluded from entering an industry once all colors are used and protected.

This Court is persuaded by the Federal Circuit's decision in *In re Owens–Corning Fiberglass Corp.,* 774 F.2d 1116 (Fed.Cir. 1985). The *Owens–Corning* court engaged in an exhaustive analysis of the issue of registration of color, both pre- and post-Lanham Act, and concluded that there is no inherent bar against registering colors as trademarks. The *Owens–Corning* court did recognize the color depletion theory as an argument against the protection of color, but concluded that "contrary to an absolute prohibition on registrability of color marks, . . . each case [should be] decided upon its facts." *Id.* at 1120. The Court also rejected the traditional shade confusion argument, stating that "deciding likelihood of confusion among color shades . . . is no more difficult or subtle than deciding likelihood of confusion where word marks are involved." *Id.* at 1123 (citation omitted).

The language of the Lanham Act is indeed broad as to what may be registered as a trademark: "[t]he term "trademark" includes any word, name, symbol, or device or any combination thereof. . . ." 15 U.S.C. § 1127. In view of this broad language, this Court agrees with the *Owens–Corning* court that there is no absolute prohibition on the registrability of color marks.

In the present case, the 3½ gallon red buckets do not make DAP's Type I mastic work any better, the red buckets are more expensive than other color buckets, specifically, white and black buckets, and there is no competitive need in the industry for red buckets since other colors are equally usable. *See, Qualitex Co. v. Jacobson Products, Inc.,* 21 U.S.P.Q.2d 1457, 1991 WL 318798 (C.D.Cal.1991).

While there may be attractive arguments in favor of the color depletion theory, this Court concludes that it is not a persuasive theory in light of available contemporary technology. There are a myriad of colors and shades available for products today that were certainly not available in the past. This, coupled with the reasoning of the *Owens–Corning* court and the broad language of the Lanham Act, leads this Court to conclude that the color depletion theory should not be applied in this case.

Color Tile has challenged DAP's failure to immediately bring infringement proceedings when it first learned of Color Tile's use of the red buckets.

Failure to proceed against an initially modest encroachment of trademark rights is generally held to be excusable. *Parrot Jungle, Inc. v. Parrot Jungle, Inc.*, 512 F.Supp 266 (S.D.N.Y.1981); *Floralife, Inc. v. Floraline International, Inc.*, 633 F.Supp. 108 (N.D.Ill.1985); *Calamari Fisheries, Inc. v. Village Catch, Inc.*, 698 F.Supp. 994 (D.Mass. 1988).

As noted above, DAP's predecessor began receiving reports in early 1990, that Greer was selling Color Tile's Type I mastic in red buckets. As also noted above, Greer's sales of mastic in red buckets were primarily limited to some former DAP customers in the New York City and New Jersey areas. Shortly after learning of Greer's sales, DAP's predecessor was faced with an attempted hostile takeover which it was able to repulse, but at great financial expense. As a result, DAP's predecessor sold various of its assets, including what is now DAP.

DAP's counsel, Mr. Tormey, testified that the offer for sale, subsequent sale, and reorganization occupied most of his time and attention, and that it was not until 1992, that he learned that DAP would retain him in his position.

In 1992, Tormey and DAP's new management were able to direct their attention to Color Tile's activities and they began investigating those activities. When DAP completed its investigation in August, 1992, it turned the matter over to outside counsel and this action was filed promptly thereafter.

Under these circumstances, this Court finds that DAP's failure to proceed immediately with its trademark infringement claim is excusable. Certainly, Fed.R.Civ.P. 11 mandates that a plaintiff engage in a reasonable investigation before instigating litigation.

Finally, in reaching these conclusions, the Court has considered the pleadings of DAP and Color Tile with respect to supplementing the record. (*See,* Doc. 37, 38, 39, 40, 42, 44). This Court finds that those pleadings and the evidence associated therewith go to the issue of secondary meaning, particularly as it relates to DAP's application with the Office of Patent and Trademark. Because this Court has concluded that Color Tile's intentional attempt to copy DAP's trade dress is sufficient at this point in the litigation to establish secondary meaning, and because the Court has determined that it need not, for purposes of this Motion address the validity of Registration No. 1,723,096, the Court finds that the additional arguments and evidence is not persuasive.

For all of the foregoing reasons, this Court finds DAP's Motion for Preliminary Injunction well taken and it is hereby GRANTED.

It is therefore ORDERED that Color Tile, its subsidiaries, directors, and affiliates, and their directors, officers, servants, agents, representatives, employees, attorneys, successors and assigns, and all persons in active concert or participation with any of them who receive actual notice of this order by personal service or otherwise, be and hereby are, ENJOINED during the pendency of this action from:

1. Packaging Type I mastic in 3½ gallon red buckets;

2. Advertising, marketing, supplying, shipping, selling, or offering for sale Type I mastic is 3½ gallon red buckets; and

3. Encouraging, assisting, or otherwise inducing any other person to resell, Type I mastic already packaged in 3½ gallon red buckets and sold by Color Tile.

Further, Color Tile is ORDERED to recall from distributors Type I mastic packaged in

3½ gallon red buckets and sold by it to distributors.

Pursuant to Fed.R.Civ.P. 65(c), DAP shall give security for the payment of such costs and damages as may be incurred or suffered by Color Tile if it is found that it has been wrongfully enjoined by depositing in the Registry of this Court the sum of Twenty Thousand Dollars ($20,000.00). Upon application and approval by the Court as to form, DAP may substitute a surety bond for the cash deposit.