**McNEIL–PPC, INC., Plaintiff,**

v.

**GUARDIAN DRUG COMPANY, INC., and Arbor Drugs, Inc., Defendants.**

**No. 97–CV–74995–DT.**

United States District Court, E.D. Michigan, Southern Division.

Nov. 10, 1997.

Robert S. Krause, Detroit, MI, Thomas C. Morrison, New York City, for Plaintiff.

Robert M. Carson, Birmingham, MI, Herschel P. Fink, Detroit, MI, for Defendants.

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND ORDER OF PRELIMINARY INJUNCTION

ROSEN, District Judge.

### I. INTRODUCTION

This trade dress infringement/unfair competition action is presently before the Court on the Motion of Plaintiff McNeil–PPC, Inc. ("McNeil") for a preliminary injunction to compel Defendants to recall all packaging, labeling and/or sales materials that infringe or dilute Plaintiff's trade dress rights with respect to one of its products, LACTAID ULTRA.[1] Defendant Arbor Drugs has responded to Plaintiff's Motion.

Having reviewed and considered the parties' briefs and supporting exhibits, and having further considered the oral arguments of counsel presented at the hearing held on October 6, 1997, the Court is now prepared to rule on Plaintiff's Motion. This Opinion and Order sets forth the Court's ruling.

### II. FACTUAL BACKGROUND

Plaintiff McNeil–PPC, Inc., a wholly-owned subsidiary of Johnson & Johnson, is a manufacturer of over-the-counter ("OTC") medications and personal care products. One such product is LACTAID ULTRA, a digestive aid for lactose-intolerant persons.

Defendant Guardian Drug Company ("Guardian") is a manufacturer of generic OTC pharmaceutical products. It produces generic versions of popular OTC brands, including products marketed by McNeil, and often manufactures and distributes these generics in the form of "private label" or "store brand" products.

---

1. Although Plaintiff's Application for Preliminary Injunction was also directed at Defendant Guardian Drug Company, Inc., Guardian has stipulated to the injunctive relief requested by Plaintiff. Therefore, the Court will only address Plaintiff's Motion as it pertains to Defendant Arbor Drugs.

Defendant Arbor Drugs has its own "store brand" line of products, which it sells in addition to brand name products. One of Arbor's store brand products is ARBOR ULTRA LACTASE, which is manufactured by Defendant Guardian.

Plaintiff contends that Arbor has deliberately copied the overall appearance of McNeil's LACTAID ULTRA packaging for its store brand ARBOR ULTRA LACTASE product.

A comparison of the packaging of Arbor's and McNeil's products shows that the packages are virtually identical in color, design and labeling. Both McNeil's LACTAID ULTRA and Defendant's ARBOR ULTRA LACTASE are packaged in boxes which have

- a dark blue background with gradually lighter-blue horizontal pinstriping
- the product brand identified in white block-print
- the word "Ultra" in cursive script
- a photo of dairy products in the center of the front panel
- a yellow informational "banner" with red script to the left of the dairy product photo
- a picture of a caplet in a "spotlight" cut-out in the lower right corner
- the number count of the package caplet contents in the lower left corner

The back panel of both Plaintiff's and Defendant's packages similarly are identical. The content of the text on the back of the packages is nearly verbatim the same and, on both packages, the text is presented in the same red and blue color combination.

Defendant does not dispute the above similarities in product packaging but does point out that, on its product, the name "ARBOR" appears prominently in white letters on the package above the product name "ULTRA LACTASE", and in small print under the product name appears the invitation "Compare to the Active Ingredient in Lactaid® Ultra". Defendant further notes that on the back of the package in small print appears a disclaimer that "This product is not manufactured by McNeil Consumer Products Company, distributor of Lactaid® Ultra."

Defendant claims the prominent display of its name, Arbor, and the "compare to" statement and disclaimer sufficiently distinguish its trade dress from that of Plaintiff. Defendant also argues that it further distinguishes the two products by placing them side-by-side with a price comparison placard (referred to as a "shelf talker") on the shelf. This price comparison marketing strategy is further carried out by Defendant in its "compare and save" newspaper, television and radio advertising campaign. Defendant contends that all of these distinguishing factors, taken together, dispel any likelihood of confusion as to the source or origin of its Arbor brand product. Therefore, Defendant argues that Plaintiff cannot establish a legally cognizable trade dress infringement claim and has no likelihood of success on the merits so as to entitle it to the preliminary injunctive relief it seeks.

## III. DISCUSSION

### A. STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF

In deciding whether a plaintiff is entitled to a preliminary injunction, the court is to consider four factors:

(1) whether the plaintiff has a strong likelihood of success on the merits;

(2) whether it would suffer irreparable harm if preliminary relief is not issued;

(3) whether the issuance of a preliminary injunction will not cause substantial harm to third parties; and

(4) whether the public interest would be served by the issuance of a preliminary injunction.

*Sandison v. Michigan High School Athletic Association, Inc.,* 64 F.3d 1026, 1030 (6th Cir.1995); *USACO Coal Co. v. Carbomin Energy, Inc.,* 689 F.2d 94, 98 (6th Cir.1982). The four considerations applicable to preliminary injunctions are *factors* to be balanced and are **not** *prerequisites* that must be satisfied. *In re Eagle–Picher Indus., Inc.,* 963 F.2d 855, 859 (6th Cir.1992). "These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *Id.*

## B. LIKELIHOOD OF SUCCESS ON THE MERITS

### 1. THE ELEMENTS OF TRADE DRESS INFRINGEMENT

Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), prohibits the use of any word, term, name, symbol, or device which:

> is likely to cause confusion, or to cause mistake or to deceive as to the affiliation, connection, or association of such person with another person, or as to origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person....

Two fairly recent Supreme Court cases dealt with trade dress infringement. In *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992), the Court ruled that a product's trade dress can be protected upon a showing of either "inherent distinctiveness" or "secondary meaning." *Id.* at 773–76, 112 S.Ct. at 2759–61. More recently, in *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995), the Court determined that a product's color alone can constitute protectable trade dress.

Guided by the above authorities, courts in the Sixth Circuit have delineated the following elements that must be established in a trade dress infringement action:

> (1) plaintiff's trade dress must be "inherently distinctive" *or* have acquired "secondary meaning" in the marketplace;
>
> (2) there must be a likelihood of confusion based on the similarity between the trade dress of the products at issue; and
>
> (3) the appropriated features of the plaintiff's trade dress must be nonfunctional.

*Mexican Food Specialties v. Festida Foods, Ltd.*, 953 F.Supp. 846, 849 (E.D.Mich.1997); *DAP Products v. Color Tile Manufacturing*, 821 F.Supp. 488, 492 (S.D.Ohio 1993); *Windmill Corp. v. Kelly Foods Corp.*, 1996 WL 33251 at *3, 76 F.3d 380 (6th Cir.1996) (unpublished opinion; text available on WESTLAW). *See also, Paddington Corp. v. Attiki Importers & Distributors*, 996 F.2d 577 (2nd Cir.1993).

### (a) "INHERENTLY DISTINCTIVE"

With respect to the "inherently distinctive" element, as the court explained in *Mexican Food Specialties*, "Since the choices that a producer has for packaging are ... almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive." 953 F.Supp. at 850. The court held that a trade dress's combination of lettering, styles, geometric shapes or colors, descriptive elements, and the "total impression" that the dress offers the observer, should be the focus of the court's inherent distinctiveness analysis. *Id.*

In *Mexican Food Specialties*, the plaintiff's product (tortillas) had a trade dress which included the registered trademark product name "Don Marcos", a picture of a man wearing a sombrero, stalks of wheat or corn and a combination of blocked text with descriptive words. The court found that the combination of elements—the depiction of a man wearing a sombrero, the use of a corn or wheat stalk, the style and six of the lettering and the use of the words "Don" and "Tortillas" and "Quality"—all contributed to an overall appearance that was inherently distinctive. (The court, therefore, found that a secondary meaning analysis was not necessary.) *Id.*

### (b) "SECONDARY MEANING"

Even if·a trade dress is not found to be "inherently distinctive", it can still be protectable if it is found to have a secondary meaning. Trade dress acquires a "secondary meaning" when it is so recognizable to the general public that it prompts the prospective customer to affirm, "That is the article that I want because I know its source." *Esercizio v. Roberts*, 944 F.2d 1235, 1239 (6th Cir.1991). Secondary meaning can be presumed when it is apparent that the defendant intentionally copied the plaintiff's trade dress. *Id. See also, DAP Products, supra*, 821 F.Supp. at 492 (secondary meaning can be presumed where a court can infer that the defendant intentionally copied plaintiff's color scheme.)

By application of the foregoing authorities, in this case, the Court finds that

the overall appearance of Plaintiff's packaging of LACTAID ULTRA with its combination of colors, block and script print, fading horizontal pinstripes and depiction of dairy foods, is "inherently distinctive." Furthermore, even if the packaging were not found to be inherently distinctive, because of the striking similarity of Plaintiff's and Defendant's packaging, the Court finds that it would be hard-pressed not to infer that Defendant intentionally copied Plaintiff's package. Intentional copying shows a strong secondary meaning of a trade dress "because there is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Esercizio v. Roberts, supra*.

For these reasons, the Court finds that Plaintiff has shown a strong likelihood of satisfying the first prong of the trade dress infringement standard.

### (c) PLAINTIFF'S TRADE DRESS IS "NON–FUNCTIONAL"

■ The Court also finds that McNeil's trade dress is not functional. A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Esercizio v. Roberts, supra*, 944 F.2d at 1246. No evidence has been presented to suggest that the any element of Plaintiff's LACTAID ULTRA packaging has any effect on the use, purpose, cost or quality of the product. Therefore, the Court finds the third element of trade dress infringement satisfied.

Having found the first and third prongs of the trade dress standard satisfied, the Court turns to ultimate issue in this case: whether there is a likelihood of confusion among consumers.

### (d) LIKELIHOOD OF CONFUSION

In *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642 (6th Cir.1982), the Sixth Circuit delineated eight factors that the Court is to consider to determine the likelihood of confusion:

1) the strength of the plaintiff's trade dress;

2) the similarity between the parties' trade dresses;

3) the relatedness of the goods;

4) the marketing channels used;

5) the likely degree of purchaser care and sophistication;

6) defendant's intent in selecting the trade dress;

7) the likelihood of expansion of the product line using the trade dress; and

8) evidence of actual confusion.

*Mexican Food Specialties, supra*, 953 F.Supp. at 850–51.

■ However, the Sixth Circuit has emphasized that these factors "are simply a guide to help determine whether confusion would be likely to result.... They imply no mathematical precision and a plaintiff need not show that all, or even most, of the factors are present in any particular case to be successful." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir.1988). The ultimate test rests on the "overall impression" of the trade dress and whether it would confuse the average consumer, not whether the products can be differentiated when subjected to a side by side, element by element comparison. *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2nd Cir.1979).

■ The Court finds in this case that six of the eight *Frisch's Restaurants* factors weigh in favor of Plaintiff.

#### 1. Strength of Plaintiff's Trade Dress

Trade dress strength is defined by the same factors considered in the "inherently distinctive" analysis. *See Mexican Food Specialties, supra*, 953 F.Supp. at 851. McNeil's LACTAID ULTRA packaging combines several colors, lettering styles, geometric shapes and depictions of dairy foods. Because the possible combinations and positions that these colors, shapes and descriptive elements can take, Plaintiff's trade dress is inherently distinctive. Accordingly, McNeil's trade dress is strong, weighing this first "strength of trade dress" factor in Plaintiff's favor.

#### 2. Similarity Between the Parties' Trade Dress

As indicated above, Defendant's packaging of ULTRA LACTASE and Plaintiff's packaging of LACTAID ULTRA are virtually iden-

tical. Both packages have a dark blue background with fading lighter-blue horizontal pinstriping; the product brand identified in white block-print; the word "Ultra" in cursive script; a photo of dairy products in the center of the front panel; a yellow informational "banner" with red script to the left of the dairy product photo; a picture of a caplet in a "spotlight" cut-out in the lower right corner; and the number count of the package's caplet content in the lower left-hand corner.

The back panels of both Plaintiff's and Defendant's packages are also substantially identical. The content of the text on the back of the packages is nearly verbatim the same. Other than the substitution of the word "Lactase" for "Lactaid", the back panels of both Defendant's and Plaintiff's packages provide as follows:

> *Lactaid [Lactase] Ultra*[2] is a dietary supplement that naturally makes dairy foods more digestible. Lactaid [Lactase] Ultra concentrates the power of three Lactaid Original Strength [Original Strength Lactase] Caplets in one small, easy-to-swallow Ultra Caplet.
>
> These caplets are conveniently packaged in single-serve packets to make them easy to carry with you.
>
> *Is Lactaid [Lactase] for You?* Yes, if you are one of the millions of people who suffer from lactose intolerance and experience digestive discomfort such as gas, cramps, bloating or diarrhea when you eat dairy foods—like milk, ice cream or cheese.
>
> *What is Lactaid [Lactase]?* Lactaid [Lactase] contains a natural enzyme that helps your body break down and digest lactose.
>
> *Uses:* Helps you enjoy dairy foods without gas, cramps, bloating or diarrhea.
>
> *How Much:* Swallow 1 Lactaid [Lactase] Ultra Caplet with your first bite of dairy food. If you suffer from severe lactose intolerance, you may have to take more than one caplet but no more than two at a time.
>
> *How Often:* Lactaid [Lactase] Ultra is natural. You can use it every day with every meal, if you like.
>
> *Consult Your Doctor:* If you experience any symptoms which are unusual or seem unrelated to the condition for which you took this product.

On both packages, the above-text is presented in the same red italic subheading and blue color text combination.[3]

This overall striking similarity of Defendant's and Plaintiff's packaging leads this Court to find that this second "similarity of the parties' trade dress" factor weighs heavily in favor of Plaintiff McNeil.

### 3. *Relatedness of the Goods and Marketing Channels Used*

There is no dispute that the respective goods of the parties are identical—both products are lactase enzyme digestive aids. Accordingly, this factor also favors Plaintiff. *See Mexican Food Specialties, supra.* The parties further do not dispute that both Plaintiff and Defendant sell their products through retail channels. This factor, too, therefore, favors McNeil. *Id.*

### 4. *Likely Degree of Purchaser Care and Sophistication*

The sophistication of retail customers of large drugstores such as Arbor Drugs is likely not to be high. Courts have adopted the general proposition that the average customer is likely not to exercise a high degree of care in purchasing relatively inexpensive and virtually products situated side-by-side

---

2. The Court notes that at the hearing on this matter, Defendant's counsel vigorously argued that Defendant's product could not be confused with Plaintiff's because the names of the products are different—Defendant's product is ULTRA LACTASE and Plaintiff's product is LACTAID ULTRA—the placement of the word "ultra" before, as opposed to after "lactase" being the distinguishing factor between the two names. However, as the quoted-language from the back panels of the parties' packages demonstrates, Defendant denominates its product throughout the text as "Lactase Ultra", with "ultra" following "lactase", the same position in which the word appears in Plaintiff's "Lactaid Ultra".

3. The only difference in the language of the text on the back panel of Defendant's product is an asterisked statement in minuscule, almost unreadable print, which states: "this product is not manufactured by McNeil Consumer Products Company, distributor of Lactaid®Ultra."

on a store shelf as in the case of Plaintiff's and Defendant's products in this case. *See Mexican Food Specialties, supra,* 953 F.Supp. at 852–53. *See also, Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.,* 748 F.2d 669 (Fed.Cir.1984) (purchasers of relatively inexpensive products held to a lesser standard of purchasing care).

Further, in assessing the likely degree of purchaser care, courts have found that the relative locations of the competing products on store shelves to be significant. *Mexican Food Specialties, supra.* As noted above, Plaintiff's and Defendant's products appear side-by-side on the store shelf. Defendant, as the store owner, no doubt is responsible for the decision to locate the products side-by-side on the shelf. The close proximity of the products on the store shelf balances this factor in favor of Plaintiff.

### 5. *Defendant's Intent in Selecting the Trade Dress*

In *Mexican Food Specialties,* the court held that "where a second-comer acts in bad faith and intentionally copies a trademark or trade dress, a presumption arises that the copier has succeeded in causing confusion." 953 F.Supp. at 853. The court went on to hold that bad faith may be presumed if the defendant had actual or constructive knowledge of the plaintiff's trade dress. *Id.* In this case, Defendant's packaging, itself, and its fine-print disclaimer that its product is not manufactured by Plaintiff, plainly demonstrates that not only did Defendant have knowledge of Plaintiff's trade dress but also that it had knowledge that the consumer would likely confuse the two. Indeed, the fact that Defendant put the disclaimer in small print on the back of the package is itself probative of not only Defendant's knowledge of possible confusion, but also that Defendant intended to confuse the consumer, at least at the point of the consumer's initial contact with the product. Therefore, the Court finds that Defendant intended to copy Plaintiff's trade dress in deciding on its own packaging design.

With respect to the two remaining *Frisch's Restaurants* factors—likelihood of expansion of the product lines and evidence of actual confusion—the Court finds the record to be void of any evidence of either of these fac-tors. However, as indicated above, the *Frisch's* factors are intended to be used only as a guide, and there is no requirement that all or even most of the factors be satisfied. The ultimate test is whether based on the "overall impression" of the trade dress, the average consumer is likely to be confused.

Applying this test, and based upon an evaluation of the *Frisch's Restaurants* factors, the Court finds that there is a strong likelihood of consumer confusion resulting from the substantial similarity of the trade dress of Plaintiff's LACTAID ULTRA and Defendant's ARBOR ULTRA LACTASE.

Defendant argues that the case of *Conopco, Inc. v. May Dept. Stores Co.,* 46 F.3d 1556 (Fed.Cir.1994), *cert. denied,* 514 U.S. 1078, 115 S.Ct. 1724, 131 L.Ed.2d 582, stands for the proposition that where, as in this case, a defendant's store-brand logo ("Arbor") is prominently placed on the front of the product and the package also contains a "compare to plaintiff's product" statement, there can be no likelihood of confusion. Defendant's argument, however, overlooks the basis for the *Conopco* decision. Underlying the Federal Circuit's finding of no likelihood of confusion in that case was the fact that the plaintiff's and defendant's products had been competing on the shelf for over 10 years.

Defendant also relies upon *Bristol–Myers Squibb Co. v. McNeil–PPC, Inc.,* 973 F.2d 1033 (2nd Cir.1992) in support of its contention that while two trade dresses may be strongly similar, the prominence of the trade names on the two packages precludes a finding of customer confusion. However, as the Court observed at the hearing on the instant matter, the two products at issue in the *Bristol–Myers* case were Tylenol and Excedrin P.M. Both products each have strong markets and name identification with the buying public, and each name has its own secondary meaning, dispelling the likelihood of customer confusion.

Defendant further argues that its "shelf talker" signs directing the customer to compare the price of Arbor's product to that of the national brand, together with its multi-million-dollar price comparison advertising campaign in the Detroit Metropolitan area, combine to insure that the buying public will

not be confused. The Court disagrees. Because Defendant is mimicking Plaintiff's packaging and placing the products side-by-side on the shelf, the price comparison signs and advertising do not dispel customer confusion as to the source or origin of the Arbor product. The signs and advertising can be read as actually telling customers "Our Arbor product is the same product as the national brand, only cheaper." Furthermore, if Arbor's goal were truly only to encourage customers to "compare" its product to the national brand, it would have made its package as distinct as possible from that of Plaintiff's product. Thus, the Court does not deem Defendant's "shelf talkers" or advertising to dispel customer confusion as to the source or origin of the Arbor product.

Defendant also argues that its entire marketing/store identification scheme is actually a comparison campaign designed not to confuse the consumer but to get the consumer to compare and contrast the products. Defendant contends that this comparison approach can be seen in the fact that the lettering of the brand-name "Arbor" on the ULTRA LACTASE package is the same as the lettering on its store signs and on its store clerks' uniforms and badges. Thus, Defendant argues that no intent to confuse can be inferred. The Court is not persuaded by this argument, either. If it were truly Defendant's intent merely to invite customers to compare its product with the national brand with no intent to confuse consumers, Defendant would have packaged its product in its store colors—orange/red and yellow—instead of Plaintiff's blue and white combination. This would have clearly drawn comparison rather than confusion.

Defendant also argues that to prevail on its Lanham Act claim of trade dress infringement, it is not enough for Plaintiff to show that customers are likely to be confused at the initial stage where they are drawn in or when they reach for the product on the shelf, but rather that it must show likelihood of confusion *at the actual point of sale.* This argument is not supported by Sixth Circuit precedent. In *Esercizio v. Roberts, supra,* the court explicitly rejected the "point of sale" argument. The Court reasoned, "Since Congress intended to protect the reputation of the manufacturer as well as to protect

purchasers, the [Lanham] Act's protection is not limited to confusion at the point of sale." *Id.* at 1245.

In *Blockbuster Entertainment Group v. Laylco, Inc.,* 869 F.Supp. 505 (E.D.Mich. 1994), a trademark infringement action, the defendant made the very same "point of sale" argument that Defendant in this case makes. Defendant argued that the use of its name "Video Busters" was not confusingly similar to "Blockbuster Video" so as to be actionable under the Lanham Act if customers are not likely to be confused at the time they actually rented video tapes in a Video Busters store. Video Busters argued that while consumers were likely to be confused initially by the similarity of the two stores' names, they were not likely to be confused once they entered Video Busters to actually rent video cassettes. Applying *Esercizio,* the court rejected Video Busters' argument, explaining:

The Sixth Circuit [has] held that the Lanham Act's protection is not limited to confusion at the "point of sale,", i.e., the time when the actual purchases take place. Rather, the Act protects against confusion among potential customers and protects the mark holders.

Therefore, the issue in this case is the degree of likelihood that the name "Video Busters" would attract potential customers based on the reputation built by Blockbuster. That a customer would recognize that Video Busters is not connected to Blockbuster after entry into a Video Busters store and viewing the Video Busters membership application, brochure, video cassette jacket, and store layout is unimportant. The critical issue is the degree to which Video Busters might attract potential customers based on the similarity to the Blockbuster name. The court finds that Video Busters might attract some potential customers based on the similarity to the Blockbuster name. *Because the names are so similar and the products sold are identical,* some unwitting customers might enter a Video Busters store thinking it is somehow connected to Blockbuster. Those customers probably will realize shortly that Video Busters is not related to Blockbuster, but under *Esercizio*

and *Grotrian[, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir.1975) ] that is irrelevant.

869 F.Supp. at 513 (emphasis added).

Although the *Blockbuster* case was a trademark, as opposed to a trade dress, action, the Court finds the court's reasoning in that case persuasive.[4] Defendant in this case uses depictions of packages of its product in its newspaper and television advertising. The Court views this no differently than the display of the confusing "Video Busters" name on the exterior of the store described in the *Blockbuster* case.

It is clear to the Court that, taken as a whole, it was Defendant's intent in appropriating Plaintiff's trade dress, not only in its packaging but also in its advertising, to confuse or "hook" customers at the initial point of contact with the product, thus initially drawing the customers to its product through the similarity in trade dress. That the customer might realize that Defendant's product is not Plaintiff's before he gets to the checkout counter to pay for it is irrelevant. Even if the consumer realizes that the Arbor product is not the same as the national brand once he picks the product up off the shelf and reads the label, Defendant has already accomplished what it set out to do, which is to confuse the consumer at the point when he first reaches for the product on the shelf. It is at that point that the damage is done. Defendant has already succeeded in utilizing the Plaintiff's trade dress to get the customer to consider buying its product. In this Court's view, this is sufficient to constitute a trade dress violation.

For all of the foregoing reasons, the Court finds that Plaintiff has demonstrated a strong likelihood of success on the merits of its Lanham Act trade dress infringement claim.

## C. *IRREPARABLE HARM*

In *Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595, 608 (6th Cir.1991), the Sixth Circuit held that a presumption of irreparable harm arises in a Lanham Act case when a likelihood of confusion is established:

> A finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears. The irreparable injury flows from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values.

943 F.2d at 608.

As discussed above, the Court finds that there *is* a likelihood of confusion with respect to Plaintiff's and Defendant's products as a result of their trade dress. Therefore, under *Wynn*, a presumption of irreparable harm arises.

## D. *POTENTIAL HARM TO THIRD PARTIES*

The harm to third parties that will arise if a preliminary injunction is issued in this case will be minimal. Customers will not be deprived of choices of brands of lactase digestive aids, nor will Defendant be precluded from selling a lactase digestive aid product; it will only be precluded from packaging its product in a trade dress similar to Plaintiff's.

## E. *PUBLIC INTEREST*

The public clearly has a strong interest in truthful marketing. Thus, the granting of the requested preliminary injunctive relief will benefit the public because it will alleviate confusion to consumers.

## *CONCLUSION*

For all of the reasons stated above in this Opinion and Order, the Court finds that the issuance of a preliminary injunction as requested by Plaintiff is warranted.

Therefore,

IT IS HEREBY ORDERED that Plaintiff McNeil–PPC's Motion for Preliminary Injunction be, and hereby is, GRANTED. Accordingly,

IT IS FURTHER ORDERED that Defendant Arbor Drugs shall immediately:

---

**4.** Indeed, much of the case law concerning trade dress infringement has "borrowed" trademark infringement law. In fact, standards which are universally applied in trade dress actions are standards derived from trademark infringement law. *See e.g., Frisch's Restaurants, supra.*

(1) Cease and refrain from selling or distributing the ARBOR ULTRA LACTASE packaging identified in Exhibit 3 to Plaintiff's Complaint;

(2) Remove from store shelves and other retail spaces all ARBOR ULTRA LACTASE packaging identified in Exhibit 3 to Plaintiff's Complaint;

(3) Cease and refrain from using, and recall from all agents, associates, affiliates or third parties, any promotional, marketing, sales or display materials depicting the ARBOR ULTRA LACTASE packaging identified in Exhibit 3 to Plaintiff's Complaint; and

(4) Cease and refrain from distributing, marketing or selling any OTC digestive aid product in packaging that is confusingly similar in appearance to packaging utilized by Plaintiff for LACTAID ULTRA.